1
2
3
4
5
6
7

8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LOGISTICS GUYS INC.,                          No.  2:23-cv-01592-DAD-CSK

12              Plaintiff,

13        v.                                        ORDER GRANTING PLAINTIFF'S MOTION
                                                    FOR A PRELIMINARY INJUNCTION
14   DOMINICK CUEVAS, et al.,
                                                    (Doc. No. 45)
15              Defendants.

16

17        This matter is before the court on plaintiff's motion for a preliminary injunction filed on

18   April 16, 2024, and brought against defendants Dominick Cuevas, Adam Nesta, and Impala

19   Freight Inc. ("Impala Freight") (collectively, "defendants").[1]  (Doc. No. 45.)  For the reasons

20   explained below, the pending motion will be granted.

21                                          **BACKGROUND**

22        This action concerns the alleged theft of trade secrets by defendants.  These trade secrets

23   purportedly provide plaintiff with a competitive advantage in the shipping industry.

24        Plaintiff The Logistics Guys Inc. ("plaintiff" or "TLG") provides transportation, logistics,

25   and supply chain management services to companies throughout the United States.  (Doc. No. 45-

26

27   [1]  Because plaintiff does not move for a preliminary injunction against the other named defendant
     in this case, defendant Tribal Logistics, Inc., the court refers to defendants Cuevas, Nesta, and
28   Impala Freight as "defendants" for simplicity.

1

2 at 5.)  Plaintiff frequently works with Transmedik Specialized ("Transmedik"), a company that assists in brokering shipments.  (*Id.*)  According to plaintiff's chief executive officer ("CEO"), Elijah Rodriguez, customer information procured during plaintiff's dealings with Transmedik constitutes trade secrets belonging to plaintiff.  (*Id.*)  In a declaration attached to plaintiff's reply in support of the pending motion, Transmedik CEO Alen Madatyan attested to the same effect, stating that "Transmedik acts as a broker for shipments arranged by its agent, TLG, which procures, manages and maintains TLG's customer base."  (Doc. No. 53-2 at 1.)  Madatyan further explained that "[c]onsistent with most broker/agent relationships of which I am aware, the Transmedik/TLG agreement provides that all of the information pertaining to customers and their shipments constitute trade secrets belonging to TLG."  (*Id.* at 2.)

Defendants Cuevas and Nesta were former employees of TLG who signed employment agreements to maintain the confidentiality of TLG's information.  (Doc. No. 45-2 at 1–2.)  The employee agreement required them to "maintain the secrecy of [plaintiff's] Confidential Information," including but not limited to:  "information concerning the nature of [plaintiff's] business, its employees, and/or its manner of operation . . . financial and accounting information, such as cost, pricing, and billing information, client and customer profiles . . . information concerning [plaintiff's] clients and/or customers and prospective clients and/or customers . . . client and customer lists . . . [and] information regarding client and/or customer habits and/or special needs."  (*Id.* at 11–12, 23.)

Defendant Cuevas was suspended from TLG on June 13, 2023, and his employment was terminated on July 5, 2023.  (*Id.* at 1.)  Impala Freight hired defendant Cuevas as an independent contractor in the summer of 2023, at an unspecified date prior to August 21, 2023.  (Doc. No. 50 at 2.)

Defendant Nesta resigned from TLG on Friday, August 18, 2023.  (Doc. No. 48 at 2.)  According to defendant Cuevas's declaration, defendant Nesta then asked if Nesta could join defendant Cuevas as an independent contractor at defendant Impala Freight.  (Doc. No. 49 at 5.)  Impala Freight's owner agreed, and defendant Nesta started work with defendant Cuevas on August 21st, 2023.  (*Id.*; *see also* Doc. No. 48 at 30.)

In support of its motion for a preliminary injunction, plaintiff submitted the declaration of Jon Berryhill, who describes himself as the president of a company that "specializes in the collection, preservation, analysis and presentation of digital evidence . . . ."  (Doc. No. 45-3 at 1.) Mr. Berryhill's forensic analysis, conducted after TLG provided him with two computers— one labeled "Adam Nesta" ("the Adam Nesta computer") and another with a user account titled "Kat"[2] ("the Kat Nesta computer")[3]—revealed concerning activities.  (Doc. No. 45-3 at 3; *see also* Doc. No. 45-2 at 31.)  Specifically, on August 15, 2023, someone using the Adam Nesta computer accessed a secure carrier database shared by TLG with its business partner Transmedik and downloaded the database onto an Excel spreadsheet.  (Doc. No. 45-3 at 4.)  Additionally, that same day, someone using the Adam Nesta computer deleted over 900 files from the local computer, which were mirrored to the plaintiff's cloud-based network, and then deleted those files again from the computer's trash bin.  (*Id.*)  According to defendant Nesta's declaration, based on the file names, the 900 files were likely "rate confirmations" and "bills of lading" (Doc. No. 48 at 22–23; *see also* Doc. No. 45-3 at 12–32), which are documents used in the shipping industry to describe the price and nature of services rendered.[4]  Also on the same day, someone using the Kat Nesta computer deleted a number of files and directories from that computer, including a directory named "thelogisticsguys.com/work/PotentialCustomers."  (Doc. No. 45-3 at 4.)

/////

---

[2]  Defendant Nesta's wife, Kat Nesta, was working for plaintiff in August 2023.  (Doc. No. 45-2 at 4.)

[3]  Defendants do not contest that these computers were used by defendant Nesta and his wife, Kat Nesta, during their employment with plaintiff.

[4]  Oddly, immediately after stating in his declaration that the first of the 900 deleted files, titled "48595.pdf," was likely a rate confirmation (Doc. No. 48 at 23) ("Assume there is a reference to '48595.pdf'.  That is a rate confirmation number . . . because these digits '48595' are similar digits to what is commonly used multiple times a days for rate confirmation . . . ."), defendant Nesta also contended that the forensic analysis had failed to reveal the content of the 900 deleted files (Doc. No. 48 at 24).  This is despite the fact that the vast majority of the 900 files had similar names suggesting they were also rate confirmations and bills of lading.  (*See, e.g.*, Doc. No. 45-3 at 12) (listing file names such as "49687.pdf" and "48796BOL.pdf").

Furthermore, Mr. Berryhill's forensic analysis revealed that on August 17 and 18, 2023, someone using the Adam Nesta computer accessed three files from a thumb drive entitled "Adam–August 2023 (run 8.18.2023).xlsx," "8.18.23.xlsx," and "Copy of Adam–July 2023 (run 08.18.23).xlsx." (*Id.* at 3.) According to plaintiff's CEO, Elijah Rodriguez, these files were sales reports originating from plaintiff's cloud-based network and included "customer and carrier data as well as company revenue, cost and profit information." (Doc. No. 45-2 at 3.) According to Rodriguez, defendant Nesta's employment did not require him to have downloaded these files onto a thumb drive because all company documents were readily available to him on plaintiff's cloud-based network. (Doc. No. 45-2 at 3). On Friday, August 18, 2023, just hours before defendant Nesta resigned, someone using the Adam Nesta computer accessed, copied, and/or deleted files from plaintiff's cloud-based network. (Doc. No. 45-3 at 4.) According to Rodriguez, these files included "customer quote data, financial and factoring files, carrier lists, labor lists, potential customer lists, white glove partner lists, licenses, insurance files, training documents, accounting files, customer set-up packets, carrier set-up packets, broker and freight forwarder agreements, bills of lading, [and] carrier confirmations . . . ." (Doc. No. 45-2 at 4; *see also* Doc. No. 45-3 at 34–39.)

On the same day that defendant Cuevas commenced working as an independent contractor at defendant Impala Freight, Monday, August 21, 2023, defendant Cuevas sent the following email to friends, family, and some of the companies that he had previously serviced while working for plaintiff: "Hello this is Dominick, and I just wanted to announce that I am now at Impala Freight as a Logistics Coordinator." (Doc. No. 49 at 31–32; *see also id.* at 35.) Defendant Nesta sent a similar email the following day, August 22, 2023. (Doc. No. 48 at 28.)

On August 23, 2023, plaintiff's CEO, Elijah Rodriguez, emailed defendant Nesta the following message: "Unauthorized possession and withholding of company property may subject you to potential legal actions. If there is any data on personal property, please erase, delete, and destroy that property." (Doc. No. 45-4 at 107.) Defendant Nesta's discovery responses in this action disclose that he then physically destroyed his personal cell phone pursuant to Rodriguez's

/////

4

1    email.[5]  (Doc. No. 45-4 at 107.)  On August 25, 2023, plaintiff sent movers to collect any

2    company property still in defendant Nesta's possession.  (Doc. Nos. 48 at 6; 45-4 at 10–12, 17,

3    20.)  Defendant's wife, Kat Nesta, created a list of items returned to the movers, but that list did

4    not include any USB drives.  (Doc. No. 45-4 at 17, 20.)[6]  In discovery, plaintiff requested

5    communications between defendant Cuevas and defendant Impala Freight, between defendant

6    Cuevas and defendant Nesta, and between defendant Cuevas and plaintiff's past customers.

7    (Doc. No. 45-4 at 113–119.)  Defendant Cuevas filed his discovery responses on November 15,

8    2023, the day they were due, claiming that his iPhone had been accidentally wiped of its

9    information during repairs at the Apple store three days earlier.  (Doc. No. 45-4 at 113.)[7]

10         Plaintiff asserts the following claims in its FAC:  (1) misappropriation of trade secrets in

11   violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.* ("DTSA"), against all

12   defendants; (2) misappropriation of trade secrets in violation of the California Uniform Trade

13   Secrets Act, California Civil Code §§ 3246.1, *et seq.* ("CUTSA"), against all defendants;

14   (3) breach of the duty of loyalty, against defendants Cuevas, Nesta, and Impala Freight;

15   (4) breach of contract, against defendant Cuevas; (5) conversion, against defendants Cuevas and

16   Nesta; (6) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g), against

17   defendant Cuevas; (7) interference with contractual relations, against defendants Cuevas, Nesta,

---

[5]  Plaintiff argues in the pending motion that defendant Nesta's discovery responses indicate that he destroyed his phone prior to receiving Rodriguez's email (Doc. No. 45-1 at 7) (stating that "Nesta physically destroyed his phone shortly after his resignation from TLG"), but that appears to reflect plaintiff's misreading of defendant Nesta's discovery responses (*see* Doc. No. 45-4 at 107) ("Upon separation of his employment (meaning when Adam quit his job), Adam surrendered the TLG owned equipment to TLG *and* Adam destroyed his own personal cell phone . . . when Elijah sent to Adam an email dated 8-23-2023 . . . .") (emphasis added).

[6]  However, in defendant Nesta's declaration in support of defendants' opposition to the pending motion, Nesta attested that the "items that I gave back included thumb drives" that were contained within a backpack, and that that backpack was included on the list produced by Kat Nesta.  (Doc. No. 48 at 27; *see also* Doc. No. 45-4 at 20.)

[7]  Plaintiff argues that defendants' conduct constitutes intentional spoliation of evidence and that the court should draw adverse inferences against defendants as a result.  (Doc. No. 45-1 at 13.) Because the court will ultimately grant plaintiff's motion for a preliminary injunction, and because any such adverse inference would not support a broader preliminary injunction than will be granted, the court need not address plaintiff's argument in this regard.

1   and Impala Freight; (8) interference with prospective economic advantage, against defendants

2   Cuevas, Nesta, and Impala Freight; and (9) violation of the Unfair Business Practices Act,

3   California Business and Professions Code §§ 17200, *et seq.*, against defendants Cuevas, Nesta,

4   and Impala Freight.

5            Plaintiff filed its motion for a preliminary injunction on April 16, 2024.  (Doc. No. 45.)

6   While plaintiff did not include therein a description of the requested injunctive relief, plaintiff did

7   include as an attachment to its motion a proposed order enjoining defendants from:  (1) soliciting

8   or contacting entities that were customers of plaintiff at any time prior to July 5, 2023;

9   (2) soliciting or contacting entities that were carriers of plaintiff at any time prior to July 5, 2023;

10  (3) using or disclosing any information obtained from plaintiff, "including but not limited to the

11  identities of plaintiff's customers or the latter's key personnel, contact information and particular

12  needs"; (4) conducting business with any entities that were customers of plaintiff at any time prior

13  to July 5, 2023; and (5) otherwise using or disclosing any of plaintiff's confidential information.

14  (Doc. No. 45-5 at 2.)  Defendants filed their opposition to the pending motion on May 2, 2024.

15  (Doc. No. 47.)[8]  That same day, defendants filed five declarations in support of their opposition to

16  the pending motion.  (Doc. Nos. 46, 48, 49, 50, 51.)  Plaintiff filed its reply to defendants'

17  opposition on May 10, 2024.  (Doc. No. 53.)

18  /////

19  /////

20  /////

21

22  [8]  The court construes this unorthodox filing to be defendants' opposition brief even though it
    does not set out or engage with the elements of a trade secret misappropriation claim, does not

23  address the legal standard applicable to motions for preliminary injunctive relief, contains only
    one citation to legal authority, and at times more closely resembles a declaration by defendant

24  Cuevas (*see* Doc. No. 47 at 5–6 (discussing what occurred "after I was fired and also after Adam
    resigned"), 8 (mentioning "Paul L. Cass[,] my lawyer")).  The court has at times generously

25  inferred what it takes to be defendants' arguments.  As factual support for their arguments in their
    opposition, defendants cite only the declarations appearing on the docket.  (*See* Doc. Nos. 46, 48,

26  49, 50, and 51.)  Defendants do not cite to specific pages of those declarations in support of any

27  factual assertion, instead citing to the declarations as a whole (which collectively span
    approximately 180 pages) for each alleged fact.  Defendants are directed to include citations to

28  specific pages in any future court filings.

**LEGAL STANDARD**

**A.     Rule 12(b)(1)**

As courts of limited jurisdiction, federal courts are presumed to be without jurisdiction over civil cases. *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377 (1994). The burden of establishing otherwise lies with the party asserting jurisdiction. *Id.* Subject matter jurisdiction is required; it cannot be forfeited or waived. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Therefore, the absence of subject matter jurisdiction can be raised by either party at any stage of the case through a motion to dismiss brought under Rule 12(b)(1). *Id.* at 506. In addition, the district court may *sua sponte* raise the issue of lack of subject matter jurisdiction. *Id.* at 514 ("[C]ourts, including this Court, have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.").

**B.     Motion for a Preliminary Injunction**

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011)) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'") (quoting *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). "In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction by showing 'serious questions go[ ] to the merits' of its claims and a balance of hardships that tips 'sharply' towards the plaintiff, so long as it makes a showing on the other two factors." *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) (citation omitted) (alterations in original). The party seeking the injunction bears the burden of proof as to each of these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened

injury as a prerequisite to preliminary injunctive relief.").  Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

## ANALYSIS

In their opposition to the pending motion, in addition to offering arguments against the granting of plaintiff's motion for a preliminary injunction, defendants contend that plaintiff lacks standing to sue defendants.  (Doc. No. 47 at 5.)  Because defendants' opposition raises questions with respect to this court's subject matter jurisdiction over this action, the court will first address defendants' standing arguments before addressing the merits of plaintiff's motion for preliminary injunction.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

**A.      Article III Standing**

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983); *see also Matter of East Coast Foods, Inc.,* 66 F.4th 1214, 1218 (9th Cir. 2023) (Because "standing is an 'essential and unchanging' requirement . . . a party must establish an Article III case or controversy before we exert subject matter jurisdiction.") (citations omitted); *City of Oakland v. Lynch*, 798 F.3d 1159, 1163 (9th Cir. 2015) ("A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and Article III federal courts lack subject matter jurisdiction over such suits.") (quoting *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004)).  An actual case or controversy will be held to exist when a plaintiff establishes standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

"[S]tanding requires that (1) the plaintiff suffered an injury in fact, i.e., one that is sufficiently 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical,' (2) the injury is 'fairly traceable' to the challenged conduct, and (3) the injury is 'likely' to be 'redressed by a favorable decision.'"  *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (*en banc*) (citing *Lujan*, 504 U.S. at 560–61).  "Standing must be shown

8

1  with respect to each form of relief sought, whether it be injunctive relief, damages or civil

2  penalties." *Id.* "[T]o establish standing to pursue injunctive relief . . . [plaintiff] must

3  demonstrate a real and immediate threat of repeated injury in the future." *Chapman v. Pier 1*

4  *Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (internal quotation omitted).

5        Defendants' primary argument in their opposition is that plaintiff lacks standing because

6  all of the entities that switched their business to defendant Impala Freight were Transmedik's

7  customers, not plaintiff's. (*See* Doc. No. 47 at 5.) Defendants have filed declarations from

8  several of those customers, who attested that they had not heard of plaintiff and that they believed

9  themselves to be doing business with Transmedik. (*See generally* Doc. No. 46.) Consequently,

10  defendants argue, plaintiff "lost no customers." (*Id.*)

11        The court finds defendants' argument that plaintiff lacks standing to bring this action to be

12  unpersuasive. Defendants do not cite any authority suggesting that plaintiff is deprived of

13  standing because it services companies in its role as an agent of Transmedik, rather than servicing

14  those companies directly. Nor has the court located any such authority. Moreover, it appears to

15  be undisputed that plaintiff has lost income as a direct result of defendants' alleged conduct.

16  Plaintiff has thus shown an "injury in fact" that is "fairly traceable" to defendants' conduct and

17  "is 'likely' to be 'redressed by a favorable decision.'" *Bates*, 511 F.3d at 985 (citation omitted).[9]

18  The court therefore concludes that plaintiff has standing to bring this action.

19

---

20  [9]  In support of their argument that plaintiff lacks standing, defendants Cuevas and Nesta describe
in their declarations multiple alleged fraudulent schemes, one of which is how plaintiff allegedly

21  fraudulently impersonated Transmedik in an attempt to build up plaintiff's own independent
customer base. (*See* Doc. Nos. 48 at 5–8; 49 at 6–10.) Oddly, defendants Cuevas and Nesta

22  describe in relative detail their own roles in perpetrating these alleged federal crimes. (*See id.*)
Defendants do not present any evidence of these schemes other than the declarations of

23  defendants Cuevas and Nesta. More importantly, despite these alleged schemes occupying a
sizeable portion of defendants' declarations and filings, defendants make little effort to explain

24  how, even if accepted as true, the alleged schemes would justify denial of the pending motion.

25  Defendants do not elaborate on how or why such alleged schemes demonstrate that plaintiff lacks
standing to bring this action. Instead, emails between plaintiff's and defendants' counsel attached

26  to the pending motion appear to show defendants' counsel threatening to reveal plaintiff's alleged
fraudulent acts if plaintiff did not voluntarily dismiss this action. (Doc. No. 45-4 at 97, 102–03.)

27  In any event, the court concludes that the alleged fraudulent schemes have little bearing on
whether plaintiff has standing to bring this action.

28

9

1  **B.      Preliminary Injunction**

2        1.      <u>Likelihood of Success on the Merits</u>

3        Plaintiff bears the burden of demonstrating that is likely to succeed on the merits of this

4  action or, at the very least, that "serious questions going to the merits were raised." *Alliance for*

5  *the Wild Rockies*, 632 F.3d at 1131.  The court turns to consideration of plaintiff's likelihood of

6  success on its claims brought under California and federal trade secrets law, the claims which are

7  at issue in plaintiff's motion for preliminary injunction.  Specifically, plaintiff seeks injunctive

8  relief against defendants with respect to its first claim for violation of the CUTSA and fifth claim

9  for violation of the DTSA.[10]

10        "California has adopted the Uniform Trade Secrets Act [ ], which codifies the basic

11  principles of common law trade secret protection."  *MAI Sys. Corp. v. Peak Computer, Inc.*, 991

12  F.2d 511, 520 (9th Cir. 1993).  "To establish a violation of the CUTSA, a plaintiff must show

13  (1) the existence of a trade secret, and (2) misappropriation of the trade secret."  *Cutera, Inc. v.*

14  *Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1205 (E.D. Cal. 2020).

15        A "trade secret" is "information, including a formula, pattern, compilation, program,

16  device, method, technique, or process, that:  (1) [d]erives independent economic value, actual or

17  potential, from not being generally known to the public . . ., and (2) [i]s the subject of efforts that

18  

---

19  [10]  Plaintiff also seeks injunctive relief against all defendants with respect to its claim for breach
of the duty of loyalty.  (Doc. No. 45-1 at 12.)  The court does not analyze this claim in detail

20  because it finds that plaintiff's trade secrets claims are sufficient to sustain the preliminary
injunction to be issued.  *See Nye*, 2024 WL 620813, at *4 n.1 ("The Court does not reach the

21  merits of [the plaintiff's] . . . breach of fiduciary duty and duty of loyalty claim . . . because any
injunctive relief would be co-extensive with the relief afforded based on [the plaintiff's]

22  misappropriation of trade secrets claims.  In other words, to the extent [the breach of fiduciary
duty and duty of loyalty claim is] grounds for enjoining Defendants from their alleged continued

23  use and disclosure of confidential information, the misappropriation of trade secrets claims are
sufficient to sustain the preliminary injunction.").  The court recognizes that it will ultimately

24  issue a narrower preliminary injunction than that requested by plaintiff.  However, as discussed

25  below, the court concludes that plaintiff's breach of the duty of loyalty claim also cannot sustain
the very broad injunction requested by plaintiff.  Specifically, such an injunction would not be in

26  the public interest and is not appropriate given the balance of equities.  *See id.*, at *8 (issuing "a

27  narrower preliminary injunction than requested" due to the public interest and balance of equities
without analyzing in detail whether the plaintiff's breach of the duty of loyalty claim could

28  sustain a broader injunction).

are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3246.1(d).  "In other words, the information 'is valuable because it is unknown to others' and 'the owner has attempted to keep [it] secret.'"  *Cutera*, 444 F. Supp. 3d at 1205 (citation omitted).

"The CUTSA defines 'misappropriation' as, *inter alia*, the acquisition of a trade secret by 'improper means,' which includes 'theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy.'"  *Id.* (quoting Cal. Civ. Code § 3246.1(a), (b)(1)). "'Misappropriation' also means disclosure or use of a trade secret without the owner's consent." *Id.* (citing Cal. Civ. Code § 3246.1(b)(2)).  "Use" includes "soliciting customers through the use of trade secret information."  *Id.* (citation omitted).

At the federal level, the DTSA similarly permits the "owner of a trade secret that is misappropriated" to bring a civil action, 18 U.S.C. § 1836(b), and includes substantially similar definitions of both "trade secret" and "misappropriation."  18 U.S.C § 1839(3), (5); *see also Cutera*, 444 F. Supp.3d at 1205.  The court can therefore analyze plaintiff's state and federal trade secret claims jointly.  *Cutera*, 444 F. Supp. 3d at 1205.

> a. *Existence of Trade Secrets*

"To prove ownership of a trade secret, plaintiffs 'must identify the trade secrets and carry the burden of showing they exist.'"  *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 659 (9th Cir. 2020) (citation omitted).  "Plaintiffs may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial."  *Id.* (citation omitted). "[A] trade secret may consist of a compilation of data, public sources or a combination of proprietary and public sources."  *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016). "Expressed differently, a compilation that affords a competitive advantage and is not readily ascertainable falls within the definition of a trade secret."  *Id.* at 1042.  "As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret."  *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997).

/////

/////

11

i. Whether the Information Derives Economic Value from Not Being Known to the Public

Plaintiff identifies the following information as trade secrets that are contained in the files allegedly downloaded, copied, and retained by defendants: "customer quote data, financial and factoring files, carrier lists, labor lists, potential customer lists, white glove partner lists, licenses, insurance files, training documents, accounting files, customer set-up packets, carrier set-up packets, broker and freight forwarder agreements, bills of lading, [and] carrier confirmations . . . ." (Doc. No. 45-2 at 4.)  In an attachment to the pending motion, plaintiff provides the file names of the hundreds of documents that were accessed, copied, and/or deleted by someone using the Adam Nesta and Kat Nesta computers.  (Doc. No. 45-3 at 7–41.)  These file names suggest that the files contained bills of lading and other pricing information (collectively, "the Pricing Information") for the companies that were serviced by plaintiff.  (*See, e.g.*, Doc. No. 48 at 22–23) (agreeing that certain file names suggest the documents are likely "rate confirmations" and bills of lading).  Defendants do not contest that the carrier database contained identities and contact information of the companies serviced by plaintiff (collectively, "the Customer Information"), but defendants Cuevas and Nesta dispute the accuracy and usefulness of that data in their declarations.  (*See, e.g.*, Doc. No. 48 at 27) ("[T]his list was absolutely useless . . . outdated, and full of information that was not accurate . . . .").

"[C]onfidential customer-related information including customer lists and contact information, pricing guidelines, historical purchasing information, and customers' business needs/preferences" are "routinely given trade secret protection." *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1214 (N.D. Cal. 2012).  According to plaintiff's CEO Rodriguez, the Customer and Pricing Information reflects whether customers need "last-minute logistical needs" or "full projects that require weeks or months of coordination and preparation," and that "[w]ithout knowing who to call at which companies (and how to reach them), it would take a competitor years or decades to re-create this information."  (Doc. No. 45-2 at 5; *see also* Doc. No. 53-2 at 1–2 (CEO of Transmedik declaring that Transmedik's relationship with plaintiff "dates back to 2009")).  Defendants argue in opposition that the identities of the companies that

12

plaintiff services are publicly available on "load boards," which function as clearinghouses of information in the shipping industry.  (Doc. No. 47 at 7.)  However, according to Rodriguez, databases such as load boards would not reveal "the identities of the customers' key decision-makers, their contact information or the company's particular needs."  (Doc. No. 45-2 at 6.)  Defendants do not argue to the contrary in their opposition.  In light of plaintiff's many years spent compiling the Customer Information; the fact that the Customer and Pricing Information describes companies' identities, contact information, and particular needs; and the fact that little of this information is publicly available on load boards, the court concludes that the Customer and Pricing Information "derive[ ] independent economic value, actual or potential, from not being generally known" to the public.  18 U.S.C. § 1839(3); Cal. Civ. Code § 3246.1(d)(1); *see also Cutera*, 444 F. Supp. 3d at 1205–06 (finding "confidential customer information, including current and prospective customer names and contact information compiled through internal research . . . [and] confidential information related to undisclosed pricing, historical quote history . . . consists of sufficiently identified compilations of information that 'derive[ ] independent economic value, actual or potential, from not being generally known to the public'") (citation omitted); *Fire Sec. Elecs. & Commc'ns Inc. v. Nye*, No. 23-cv-02730-DLR, 2024 WL 620813, at *3 (D. Ariz. Feb. 14, 2024) ("[W]here the party compiling the customer lists, while using public information as a source, . . . expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection.") (citation omitted).

The court's finding in this regard is bolstered by the timing of defendants' conduct.  As will be discussed in greater detail below, the court concludes that plaintiff is likely to successfully demonstrate that defendant Nesta downloaded, copied, and deleted the Customer and Pricing Information immediately before moving to a competitor.  Defendant Cuevas was terminated from his employment with plaintiff on July 5, 2023 and went to work for defendant Impala Freight some time thereafter, but he did not send his announcement email to plaintiff's clients until August 21, 2023, the first business day after defendant Nesta left plaintiff's employ with plaintiff's trade secrets.  *See Pyro Spectaculars North, Inc. v. Souza*, 861 F. Supp. 2d 1079, 1090

13

1    (E.D. Cal. 2012) ("Finally, defendant's argument that all of the information . . . is readily

2    available to the public is undercut by his own actions in this case.  If the information is truly

3    readily available to the public, it raises the question of why it was necessary for defendant to

4    surreptitiously download, retain, and funnel the . . . information to his new employer in the first

5    place.").

6                           ii.      Whether Plaintiff Took Reasonable Measures to Maintain Secrecy

7            In support of its motion for a preliminary injunction, plaintiff has produced evidence

8    showing that it required employees to sign confidentiality agreements prohibiting the

9    unauthorized use or disclosure of its trade secrets and used a "secure cloud network system to

10   protect its electronic files."  (Doc. No. 45-2 at 1–3, 9–29.)  Plaintiff has also provided copies of

11   the confidentiality agreements signed by defendants Cuevas and Nesta as attachments to its

12   motion.  (*See* Doc. No. 45-2 at 9–29.)  Defendants argue that "because [plaintiff's CEO] liked to

13   share information to just about anyone, there were no efforts to maintain secrecy amongst the

14   employees of TLG."  (Doc. No. 47 at 7.)  Defendants, however, provide no authority to support

15   the position that sharing trade secrets with one's own employees who have signed confidentiality

16   agreements somehow renders that information non-secret.  Consequently, the court finds that

17   plaintiff took reasonable measures to maintain the secrecy of the Customer and Pricing

18   Information, and that the Customer and Pricing Information thus constituted trade secrets.  *See*

19   *Cutera*, 444 F. Supp. 3d at 1206–07 (finding that information "was likely 'the subject of efforts

20   that are reasonable under the circumstances to maintain its secrecy'" where the plaintiff

21   "require[d] employees to sign confidentiality agreements that require employees to keep

22   information including 'customer lists' . . . confidential"); *WeRide Corp. v. Kun Huang*, 379 F.

23   Supp. 3d 834, 847 (N.D. Cal. 2019) (finding that the plaintiff had shown that it made reasonable

24   efforts to protect the secrecy of its information by requiring employees to sign confidentiality

25   agreements and by requiring a username and password to access the information).

26          Plaintiff has thus showed a likelihood of success on the merits as to its ownership of trade

27   secrets in the Customer and Pricing Information.

28   /////

                                                14

1          b.       *Whether Defendants Misappropriated the Trade Secret*

2          "The CUTSA defines misappropriation as including the '[a]cquisition of a trade secret of

3    another by a person who knows or has reason to know that the trade secret was acquired by

4    improper means' and the 'use of a trade secret of another without express or implied consent by a

5    person who [ ] [u]sed improper means to acquire knowledge of the trade secret.'"  *Cutera*, 444 F.

6    Supp. 3d at 1207 (quoting Cal. Civ. Code § 3246.1(b)).  "Misappropriation under the DTSA is

7    identical to that under the CUTSA in this respect."  *Id.* (citing 18 U.S.C. § 1839(5)).

8          Plaintiff has come forward with evidence suggesting that defendant Nesta downloaded its

9    carrier database, deleted hundreds of bills of lading from plaintiff's cloud-based network,

10   downloaded sales reports onto a USB drive, and accessed client lists and pricing information just

11   before resigning from his position with plaintiff.  Plaintiff has also provided evidence suggesting

12   that Kat Nesta deleted files at defendant Nesta's direction.  According to plaintiff, defendant

13   Nesta immediately began working for defendant Impala Freight and then provided plaintiff's

14   trade secrets to defendant Cuevas.  The evidence presented in connection with the pending motion

15   strongly suggests that defendant Cuevas promptly used the Customer Information to contact

16   approximately a dozen of plaintiff's clients that he had not previously contacted, presumably

17   because defendant Cuevas had been unable to locate their contact information prior to defendant

18   Nesta's move.  These clients subsequently switched their business to defendants Impala Freight.

19   Plaintiff argues, and the court agrees, that this sequence of events strongly implies that defendants

20   used plaintiff's trade secrets, including the Customer and Pricing Information, in their dealings

21   with plaintiff's clients.

22         Defendants advance several unconvincing arguments in their opposition to the pending

23   motion and their declarations in support of that opposition.  Defendant Nesta stated in his

24   declaration that the Berryhill declaration only shows that "*someone* (not identified)" used the

25   Adam and Kat Nesta computers to download, delete, and copy plaintiff's files.  (Doc. No. 48 at

26   ¶¶ 26–29, 32.)  Defendant Nesta has suggested that someone else remotely accessed the Adam

27   and Kat Nesta computers and used them to download the carrier database, delete hundreds of bills

28   of lading, and copy and/or delete the files on plaintiff's cloud-based network.  (*Id.*)  In particular,

1   defendant Nesta declared that Rodriguez, plaintiff's CEO, would "often" use "Team Viewer"

2   software to access the Adam and Kat Nesta computers.  Defendant Nesta further stated in his

3   declaration that he "d[id] not recall" downloading the carrier database.  (*Id.* at ¶ 34.)  Plaintiff

4   points out in reply that defendant Nesta never affirmatively denied engaging in the alleged actions

5   (Doc. No. 53 at 4), but instead only issued general denials such as "I did not steal anything from

6   TLG" (Doc. No. 48 at ¶ 35).  Moreover, defendant Nesta did not affirmatively state in his

7   declaration that someone else might have accessed his computer to download sales reports to a

8   USB drive.  To the contrary, on March 21, 2024, defendant's counsel seemingly confirmed in an

9   email to plaintiff's counsel that defendant Nesta "downloaded some data onto a *thumb drive*" on

10  August 17 and 18 to ensure that plaintiff paid him his full commissions on all of his recent sales.

11  (Doc. No. 45-4 at 8.)[11]  It appears undisputed that defendant Nesta retained this thumb drive until,

12  at the earliest, August 25, 2023, several days after starting to work with defendants Cuevas and

13  Impala Freight.

14          Defendants Nesta and Cuevas also declared that it was standard practice for defendant

15  Nesta to delete files containing bills of lading once a job had concluded.  (*See, e.g.*, Doc. No. 48

16  at ¶ 32.)  However, even if the court credits defendants' representations as true in this regard,

17  defendants offer no evidence to explain why defendant Nesta might have deleted 900 such files in

18  one day.  For instance, there is no evidence before the court that defendant Nesta concluded 900

19  jobs that day, or that he routinely waited to delete a large batch of files all at once.  *Compare AEG*

20  *Holdco LLC v. Vazquez*, 21-cv-05290-VAP-AGR, 2021 WL 4859975, at *15 (C.D. Cal. Sept. 22,

21  2021) (finding that the plaintiff had failed to show a likelihood of success on the merits regarding

22  misappropriation in part because of the defendants' evidence supporting the plausible alternative

23  explanation that hundreds of files were downloaded "pursuant to an automatic archiving

24  _____

25  [11]  The court notes that defendant's counsel offered that explanation for why defendant Nesta
    downloaded the files onto the thumb drive—namely, to check that his payments from plaintiff

26  matched his commissions—on March 21, 2024.  That is, defendants' counsel offered this
    explanation before plaintiff's counsel produced the results of the forensic computer analysis

27  detailing the specific files accessed, copied, and deleted.  Defendants did not offer similar
    explanations in their opposition and declarations filed after receiving the results of plaintiff's

28  forensic analysis.

1    process").  To the contrary, defendant Nesta attested that four of plaintiff's employees

2    collectively handled "about 400 loads a month" (Doc. No. 48 at ¶ 31), suggesting that the

3    hundreds of deleted bills of lading represented several months' worth of files that were all deleted

4    in one day.

5          Finally, defendants argue that clients stopped using plaintiff's services due to defendants'

6    superior customer service rather than any alleged use of trade secrets.  (Doc. No. 47 at 5–7; *see*

7    *generally* Doc. No. 46 (plaintiff's former customers attesting that they switched to defendant

8    Impala Freight because of the better customer service provided by defendants Cuevas and

9    Nesta)).  However, defendants do not explain how these clients would know whether or not, for

10   example, defendants used the downloaded bills of lading to determine each customer's

11   specialized needs and undercut plaintiff's pricing.  *Cf. Cool Runnings*, 2021 WL 5331453, at *10

12   (inferring that the defendant used the plaintiff's trade secrets where "misuse of that information

13   might be 'virtually untraceable'" because the defendant "might claim . . . that it has its own

14   system for generating bid proposals and its own pricing and vendor relationships that have

15   nothing to do with plaintiff's trade secrets").  The court again notes the evidence regarding the

16   timing of the events in question:  The large majority of plaintiff's former clients who provided

17   declarations stated that they switched their business to defendants after receiving an email from

18   defendant Cuevas on August 21, 2023, the same day defendant Nesta began working with

19   defendant Cuevas while admittedly in possession of at least some of plaintiff's downloaded files.

20         Lastly, defendants argue that Cuevas and Nesta did not solicit any customers but instead

21   merely announced a change in their employment.  (Doc. No. 47 at 9.)  The court recognizes that

22   "[m]erely informing a former employer's customers of a change of employment, *without more*, is

23   not solicitation."  *MAI Sys.*, 991 F.2d at 521 (emphasis added); *see also ExamWorks, LLC v.

24   Baldini*, 835 F. App'x 251, 252 (9th Cir. 2020)[12] ("In addition, 'although an individual may

25   violate the UTSA by using a former employer's confidential client list to *solicit* clients, the UTSA

26   does not forbid an individual from announcing a change of employment, even to clients on a

27   ────────────────

28   [12]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1    protected trade secret client list.'") (citation omitted).  Here, however, the evidence presented in

2    connection with plaintiff's pending motion strongly suggests that defendants also downloaded

3    and used information regarding clients' needs and the pricing of past jobs.  *Cf. Cutera*, 444 F.

4    Supp. 3d at 1207 ("As plaintiff's counsel pointedly asks, why else would they have copied this

5    information in particular?").

6          Consequently, the court concludes that plaintiff has shown a likelihood of success in

7    satisfying the misappropriation element of its trade secret claim.  *See Cool Runnings*, 2021 WL

8    5331453, at *8–9 (finding that the plaintiff had shown a likelihood of success of satisfying the

9    misappropriation element of its trade secret claim in part because the evidence suggested that the

10   defendant retained his employer-issued laptop after resigning); *Cutera*, 444 F. Supp. 3d at 1207–

11   08 (finding that the plaintiff had shown a likelihood of success of satisfying the misappropriation

12   element of its trade secret claim where the evidence suggested that the defendants downloaded

13   large amounts of data onto external devices immediately before departing, possessed this

14   information after beginning employment with the plaintiff's competitor, and then used the trade

15   secret information to the plaintiff's disadvantage).

16          2.      Whether Plaintiff Will Suffer Irreparable Harm

17          Having determined that plaintiff has shown a likelihood of success on the merits of its

18   trade secrets claim against defendants, the court turns to consider whether plaintiff has shown that

19   it will suffer irreparable harm absent the granting of a preliminary injunction.  *Winter*, 555 U.S. at

20   20.  A party suffers "irreparable harm" when the wrong cannot be adequately compensated by

21   remedies available at law, such as monetary damages.  *See Cool Runnings*, 2021 WL 5331453, at

22   *9.

23          Plaintiff argues that the loss of customers and goodwill presents a sufficient threat of

24   irreparable harm at the preliminary injunction stage.  (Doc. No. 45-1 at 14–15.)  Defendants argue

25   that plaintiff did not lose any customers because, they argue, those customers in fact belonged to

26   Transmedik.  (Doc. No. 47 at 5.)  Defendants present no authority suggesting that plaintiff's

27   arrangement with Transmedik forecloses the possibility of plaintiff suffering irreparable harm

28   absent the requested injunction.  To the contrary, "[i]t is well established that the loss of market

18

1  position and the disclosure of trade secrets can constitute irreparable harm." *WeRide*, 379 F.

2  Supp. 3d at 853–54; *see also Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-00939-WHA, 2017 WL

3  2123560, at *11 (N.D. Cal. May 15, 2017) (finding irreparable harm in part because it "would

4  likely be futile to attempt, after the fact, to estimate the monetary value of injury suffered from

5  . . . the loss of Waymo's competitive position").

6  　　　The court concludes that plaintiff has met its burden of showing a likelihood of irreparable

7  harm.  It is undisputed that more than a dozen companies have ceased using plaintiff's services

8  and switched to defendant Impala Freight and that almost all of these companies made the switch

9  after receiving defendant Cuevas's August 21, 2023 email.  (*See* Doc. No. 46.)  Defendant Nesta

10  does not dispute that on that date, he was in possession of certain files that the court has

11  concluded likely constituted trade secrets, and the evidence strongly suggests that he was in

12  possession of a great deal more.  As discussed above, the timing of Cuevas's August 21, 2023

13  email also strongly suggests that defendants used plaintiff's customer database.  The court can

14  therefore easily draw the reasonable inference that defendants used plaintiff's other trade secrets

15  as well, such as the Pricing Information, especially given that defendants continue to deny only in

16  conclusory terms using any trade secrets at all.

17  　　　The evidence currently before the court supports the conclusion that there is a strong

18  likelihood that defendants are using plaintiff's Customer and Pricing Information "to [their]

19  competitive benefit and to plaintiff's harm—a harm that is irreparable since it cannot be cured

20  through the award of monetary damages." *Cool Runnings*, 2021 WL 5331453, at *10.

21  Accordingly, the court concludes that plaintiff has shown that it will suffer irreparable harm

22  without the granting of preliminary injunctive relief.  *See id.* (finding that the plaintiff had shown

23  irreparable harm where the defendant "deliberately transferred a large quantity of electronic

24  information consisting of plaintiff's documents and folders from his Cool Runnings laptop to an

25  external drive" and the evidence suggested that the defendants had used that information to the

26  plaintiff's detriment); *Cutera*, 444 F. Supp. 3d at 1208–09 (finding that the plaintiff had shown

27  irreparable harm because the evidence suggested that the defendant had downloaded the

28  /////

1    plaintiff's trade secrets immediately before switching companies and that the defendant "already

2    has used at least some of [the plaintiff's trade secrets] to [the defendant's] apparent advantage").[13]

3             3.    Public Interest and the Balance of Equities

4         "In exercising their sound discretion, courts of equity should pay particular regard for the

5    public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at

6    24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  Trade secrets cases

7    involving former employees generally invoke two competing public interests:

8                  On the one hand, California has a "settled legislative policy in favor
                   of open competition and employee mobility," protecting "the
9                  important legal right of persons to engage in businesses and
                   occupations of their choosing." *Edwards v. Arthur Andersen LLP*,
10                 44 Cal. 4th 937, 946 (2008).  On the other hand, the state also has a
                   strong policy in favor of protecting trade secrets. *Retirement Group*
11                 *v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009) ("An equally
                   lengthy line of cases has consistently held former employees may
12                 not misappropriate the former employer's trade secrets to unfairly
                   compete with the former employer.").
13

14   *Pyro Spectaculars*, 861 F. Supp. 2d at 1092.  Additionally, a court "must 'balance the interests of

15   all parties and weigh the damage to each' in determining the balance of the equities." *CTIA-The*

16   *Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019) (citation omitted).  These

17   considerations warrant the issuance of a narrower injunction than plaintiff has requested in this

18   case.

19        As noted above, plaintiff attached to its motion a proposed order that would enjoin and

20   restrain defendants from:  (1) soliciting or contacting entities that were customers of plaintiff at

21   any time prior to July 5, 2023; (2) soliciting or contacting entities that were carriers of plaintiff at

22   any time prior to July 5, 2023; (3) using or disclosing any information obtained from plaintiff,

23   "including but not limited to the identities of plaintiff's customers or the latter's key personnel,

24   ───────────────

25   [13]  Defendants also argue that plaintiff will suffer no harm to its goodwill because nearly all of the
     former customers attested in their declarations that they thought defendants Cuevas and Nesta
26   worked for Transmedik, not plaintiff, and because the former customers attested that they were
     not familiar with plaintiff.  (Doc. No. 47 at 8; *see generally* Doc. No. 46.)  Because the court finds
27   that plaintiff has met its burden to show irreparable harm on other grounds, namely the loss of
     market position and the difficulty of estimating damages, the court need not—and therefore does
28   not—address defendants' argument in this regard.

1   contact information and particular needs"; (4) conducting business with any entities that were

2   customers of plaintiff at any time prior to July 5, 2023; and (5) otherwise using or disclosing any

3   of plaintiff's confidential information.  (Doc. No. 45-5 at 2.)

4        This proposed injunction is impermissibly broad in several respects.  Notably, plaintiff's

5   proposed injunction would prohibit defendants from announcing their change of employment,

6   would prohibit the use of all "information obtained from plaintiff" rather than being limited to

7   plaintiff's trade secrets, and, most importantly, would apply to all customers of plaintiff prior to

8   July 5, 2023, rather than being targeted to those customers actually solicited by defendants using

9   plaintiff's trade secrets.  While a district court may preliminarily enjoin a defendant from

10  conducting business with a plaintiff's former customers that the defendant solicited using the

11  plaintiff's misappropriated trade secrets, the court may not enjoin the defendant from conducting

12  business with all of the plaintiff's former customers.  *See Morlife, Inc. v. Perry*, 56 Cal. App. 4th

13  1514, 1527–28 (1997) (affirming the issuance of an injunction enjoining the defendants "from

14  doing business with any of the 32 entities who switched their business . . . after being unlawfully

15  solicited"); *ExamWorks*, 835 F. App'x at 252 ("[T]he 'conducting business' provision prevents

16  defendants from conducting business with any ExamWorks customer identified in the

17  misappropriated trade-secret information, even if defendants did not directly or indirectly use the

18  trade-secret information to solicit that customer.  The district court's findings do not justify an

19  injunction of that breadth, which prevents defendants from engaging in lawful business.").

20       Instead, the court will enjoin defendants from directly or indirectly retaining, using,

21  transmitting, disseminating, or disclosing the Customer and Pricing Information, including but

22  not limited to the identities, key contact information, and particular needs for plaintiff's current

23  and former customers contained in the downloaded files, as well bills of lading and other pricing

24  information.  The court will enjoin defendants from using the Customer and Pricing Information

25  for the purpose of directly or indirectly soliciting any of plaintiff's customers or potential

26  customers, including companies serviced by plaintiff in connection with Transmedik, or for

27  conducting business with those entities.  The court will further enjoin defendants from conducting

28  business with any of plaintiff's customers that defendants solicited using the Customer and

1 Pricing Information.  The court will also direct defendants to return to plaintiff all documents,

2 materials, or information which constitute, contain or summarize the Customer and Pricing

3 Information, and to thereafter purge or destroy any and all copies, recordings, electronic copies,

4 or reproductions of the Customer and Pricing Information returned to plaintiff.  Lastly, the court

5 will direct defendants to produce affidavits signed under penalty of perjury verifying defendants'

6 compliance with the court's order.

7       This narrow injunction "will therefore not bar [defendants] from continuing to work, nor

8 will it mandate that defendant[s] do anything other than abide by the law."  *Cool Runnings*, 2021

9 WL 5331453, at *12; *see also id.* (finding that "the balance of the equities weighs in plaintiff's

10 favor" and therefore issuing "a narrowly tailored injunction [that] will prevent [the defendant]

11 from using misappropriated information" while "also recogniz[ing] defendant's concerns

12 regarding the broad, vague, and intrusive nature of the preliminary relief requested by plaintiff");

13 *Cutera*, 444 F. Supp. 3d at 1210 (declining "to issue the broad injunction requested by plaintiff"

14 to "avoid undermining the public interest in promoting the mobility of employees, subject to

15 lawful restrictions including the protection of trade secrets," and instead issuing "an injunction

16 'specifically focused' on [the plaintiff's] use of any misappropriated trade secrets").

17     4.   <u>The Appropriate Bond</u>

18       The court may issue a preliminary injunction only if the movant gives security in an

19 amount that the court considers proper to pay the costs and damages sustained by any party found

20 to have been wrongfully enjoined.  Fed. R. Civ. P. 65(c).  The court may dispense with the filing

21 of a bond if "there is no realistic likelihood of harm to the defendant from enjoining his or her

22 conduct."  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

23       Plaintiff requests imposition "of a minimal bond" set at $5,000.  (Doc. No. 45-1 at 15.)

24 Defendants do not respond to this request, nor do they request a higher bond.[14]  Because

---

25 [14]  In their opposition to plaintiff's motion for a temporary restraining order, defendants had

26 previously requested a bond set at $1 million premised on defendant Cuevas's alleged yearly income of $350,000–$500,000.  (Doc. No. 7 at 6–7.)  The court notes that defendants also argued

27 in that same filing that defendant Cuevas had been "struggling to get back on [his] feet financially."  (*Id.* at 11.)  In any event, as noted, defendants do not make a similar argument in

28 their opposition to plaintiff's motion for a preliminary injunction.

1    defendants have provided no evidence or argument in support of a higher figure, the court sets the

2    bond amount at $5,000.  *See Cutera*, 444 F. Supp. 3d at 1211 (setting the bond amount at $5,000

3    where the defendant "has not submitted any evidence" showing a higher bond was appropriate);

4    *Cool Runnings*, 2021 WL 5331453, at *12 (same).

5                                          **CONCLUSION**

6         For the reasons set forth above,

7    1.       Plaintiff's motion for a preliminary injunction (Doc. No. 45) is granted as follows:

8              a.       Defendants Dominick Cuevas, Adam Nesta, and Impala Freight Inc. are

9                       enjoined and restrained from directly or indirectly retaining, using,

10                      transmitting, disseminating, or disclosing plaintiff's Customer and Pricing

11                      Information, including but not limited to the identities, key contact

12                      information, and particular needs for plaintiff's current and former

13                      customers, as well bills of lading and other pricing information;

14             b.       Defendants Dominick Cuevas, Adam Nesta, and Impala Freight Inc. are

15                      enjoined and restrained from using plaintiff's Customer and Pricing

16                      Information for the purpose of directly or indirectly soliciting any The

17                      Logistics Guys customers or potential customers, including companies

18                      serviced by The Logistics Guys in connection with Transmedik;

19             c.       Defendants Dominick Cuevas, Adam Nesta, and Impala Freight Inc. are

20                      enjoined and restrained from using plaintiff's Customer and Pricing

21                      Information for the purpose of conducting business with any The Logistics

22                      Guys customers or potential customers;

23             d.       Defendants Dominick Cuevas, Adam Nesta, and Impala Freight Inc. are

24                      enjoined and restrained from conducting business with any The Logistics

25                      Guys customers that they solicited using plaintiff's Customer and Pricing

26                      Information;

27             e.       Defendants Dominick Cuevas, Adam Nesta, and Impala Freight Inc. shall,

28                      within five (5) days from the date of entry of this order, return to plaintiff

                                                 23

1    (through plaintiff's counsel) all documents, materials, or information which

2    constitute, contain or summarize plaintiff's Customer and Pricing

3    Information;

4    f.    Defendants Dominick Cuevas, Adam Nesta, and Impala Freight Inc. must,

5          within six (6) days from the date of entry of this order, purge and destroy

6          any and all copies, recordings, electronic copies, or reproductions of the

7          Customer and Pricing Information;

8    g.    Defendants Dominick Cuevas, Adam Nesta, and Impala Freight Inc. shall,

9          within seven (7) days from the date of entry of this order, file with this

10         court an affidavit signed under penalty of perjury, setting forth in detail the

11         manner and form in which they have complied with this order;

12   h.    Defendants Dominick Cuevas, Adam Nesta, and Impala Freight Inc. shall

13         not act in concert with any third-party, including defendant Tribal Logistics

14         Inc., to accomplish what is otherwise prohibited by this court's order;

15   i.    Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, absent

16         subsequent waiver by the court, within ten (10) days from the date of entry

17         of this order, plaintiff must post a $5,000 bond;

18   j.    This preliminary injunction is issued without prejudice to plaintiff or

19         defendant seeking additional discovery or seeking other equitable or legal

20         relief as appropriate; and

21   k.    This preliminary injunction shall become immediately effective and shall

22         remain in full force and effect through the date on which judgment, if any,

23         as to the enjoined defendant is entered in this matter.

24   IT IS SO ORDERED.

25   Dated:   **June 12, 2024**

26                                               DALE A. DROZD
27                                               UNITED STATES DISTRICT JUDGE

28