1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LOGISTICS GUYS INC.,                    No. 2:23-cv-01592-DAD-CSK

12              Plaintiff,

13        v.                                 ORDER DENYING PLAINTIFF'S MOTION
                                             TO HOLD DEFENDANTS IN CONTEMPT
14   DOMINICK CUEVAS, et al.,                OF COURT

15              Defendants.                  (Doc. Nos. 87, 101, 103)

16

17

18        This matter is before the court on plaintiff Logistics Guys Inc.'s September 10, 2024

19   motion seeking to have defendants Dominick Cuevas ("Cuevas"), Adam Nesta ("Nesta"), and

20   Impala Freight Inc. ("Impala Freight") (collectively, "defendants") held in contempt of court.[1]

21   (Doc. No. 87.)  On September 16, 2024, the pending motion was taken under submission on the

22   papers pursuant to Local Rule 230(g).  (Doc. No. 90.)  For the reasons explained below,

23   plaintiff's motion will be denied.

24   /////

25   /////

26   /////

27   _____

28   [1]  Plaintiff does not seek contempt sanctions against defendant Tribal Logistics Inc.  (Doc. No. 87
     at 1.)

                                             1

**BACKGROUND**

A.      **Factual Background[2]**

Plaintiff is a company that provides transportation and logistics services to companies throughout the United States.  (Doc. No. 45-2 at 5.)  Elijah Rodriguez is plaintiff's chief executive officer ("CEO").  (*Id.*)  Defendant Cuevas and Nesta are former employees of plaintiff.  (*Id.* at 1–2.)  Defendant Impala Freight also provides transportation and logistics services and is plaintiff's competitor.  (Doc. No. 50 at 2.)

On June 13, 2023, plaintiff suspended defendant Cuevas.  (*Id.* at 1.)  Thereafter, on July 5, 2023, plaintiff terminated defendant Cuevas's employment.  (*Id.*)  That same day, defendant Cuevas went to work for one of plaintiff's clients, Primo Fitness.  (Doc. No. 108 at ¶¶ 8–9.)  Primo Fitness is a company that installs fitness equipment across the country.  (Doc. No. 107 at 12.)  In his new role managing Primo Fitness's logistics department, defendant Cuevas was required to work directly with manufacturers and other installers.  (*Id.*; Doc. No. 108 at ¶ 6.)  Primo Fitness maintained its relationship with plaintiff, so defendant Cuevas remained in contact with plaintiff's employees, including defendant Nesta.  (Doc. No. 108 at ¶ 6.)  Because Primo Fitness did not provide company phones, defendant Cuevas was required to use his personal cell phone to contact individuals in connection with his employment.  (Doc. No. 107 at 12.)  At an unspecified date prior to August 21, 2023, defendant Cuevas left Primo Fitness and went to work as an independent contractor for defendant Impala Freight.  (Doc. No. 50 at 2.)

On August 15, 2023, someone using defendant Nesta's computer accessed a database shared by plaintiff with its business partner and downloaded that database onto an Excel spreadsheet.  (Doc. No. 45-3 at 4.)  That same day, someone using Nesta's computer deleted over 900 files from the local computer, which were mirrored to plaintiff's cloud-based network, and then deleted those files again from the computer's trash bin.  (*Id.*)  These files were likely rate confirmations and bills of lading, documents used in the shipping industry to describe the price and nature of services rendered.  (Doc. Nos. 48 at 22–23; 45-3 at 12–32.)  Hours before Nesta's

---

[2]  The court will provide an abbreviated factual background to the pending motion here because it provides a more detailed discussion of the relevant facts in its analysis of the motion.

1    resignation from his job with plaintiff on August 18, 2023, someone using his computer accessed,

2    copied, and/or deleted files from plaintiff's cloud-based network, including customer quote data

3    and potential customer lists. (Doc. Nos. 45-2 at 4; 48 at 2.) Defendant Nesta began work with

4    defendant Impala Freight as an independent contractor shortly thereafter, on August 21, 2023.

5    (Doc. No. 48 at 30.)

6        On August 21, 2023, defendant Cuevas sent the following email to friends, family, and

7    some of the companies that he had previously serviced while working for plaintiff: "Hello this is

8    Dominick, and I just wanted to announce that I am now at Impala Freight as a Logistics

9    Coordinator." (Doc. No. 49 at 31–32.) Defendant Nesta sent a similar email the following day.

10   (Doc. No. 48 at 28.) Subsequently, many of plaintiff's clients switched all or part of their

11   business from plaintiff over to defendant Impala Freight. (*See, e.g.*, Doc. No. 110 at ¶ 21.)

12   **B.    Procedural Background**

13       On June 13, 2024, the court issued an order granting plaintiff's motion for preliminary

14   injunction and enjoining defendants from, among other things, conducting business with any of

15   plaintiff's customers who defendants solicited using plaintiff's trade secrets ("the Injunction").

16   (Doc. No. 54 at 23–24.) On August 8, 2024, the court issued an order granting plaintiff's request

17   for an order requiring defendants to show cause why they should not be held in contempt of court

18   for failing to comply with the terms of the Injunction. (Doc. No. 68.) On August 15, 2024,

19   defendants filed four affidavits detailing their compliance with the Injunction.[3] (Doc. Nos. 69–

20

21   ---

     [3]  In its pending motion, plaintiff asserts that three of those affidavits—docket numbers 69, 70,

22   and 71—include detailed information regarding plaintiff's customers and thereby disseminate
     plaintiff's trade secrets in violation of the Injunction. (Doc. No. 87-1 at 7.) Plaintiff therefore

23   requests that the court order defendants to withdraw those affidavits and refile them under seal.
     (*Id.*) The documents filed by defendants run more than 300 pages in total. (*See* Doc. Nos. 69–

24   71.) In its three-sentence request, plaintiff provides no explanation as to which sections of these
     documents purportedly contain trade secrets, what those trade secrets are, why plaintiff did not

25   request the seal of these documents until nearly one month after they were filed on the public
     docket, or why all 300 pages of the documents must be filed under seal rather than redacted in

26   part. The court therefore denies plaintiff's conclusory request as deficient. *See Pintos v. Pac.
     Creditors Ass'n*, 605 F.3d 665, 667 (9th Cir. 2010) (explaining the two standards for requests to

27   seal); (*cf.* Doc. No. 13) (denying plaintiff's conclusory request to seal the entirety of a 12-page
     declaration filed by defendant Cuevas where three lines in that declaration contained the names of

28   two of plaintiff's clients).

72.)  In light of defendants' affidavits, the court discharged the order to show cause on August 19, 2024 without prejudice to plaintiff filing a motion seeking to have defendants held in contempt of court.  (Doc. No. 74.)

On September 10, 2024, plaintiff filed its motion to hold defendants in contempt of court. (Doc. No. 87.)  Defendants filed their oppositions to the pending motion on September 26, 2024. (Doc. Nos. 92–97.)  On October 7, 2024, plaintiff filed its reply thereto.  (Doc. No. 99.)  That same day, plaintiff filed a notice of its request to seal the declaration of plaintiff's counsel Kenneth M. Weinfield filed in support of the pending motion, and to seal exhibits A and B thereto, on the grounds that those documents contained defendants' phone records ("the Phone Records").  (Doc. No. 100.)  The court granted plaintiff's request to seal on November 20, 2024. (Doc. No. 102.)  Plaintiff argues in its reply that the frequency and pattern of defendants' contacts with plaintiff's former clients, as documented in the Phone Records, proves that defendants are continuing to do business with plaintiff's clients who were solicited using plaintiff's trade secrets in violation of the court's Injunction.  (Doc. No. 99.)

The court directed defendants to file a sur-reply addressing the new arguments and evidence presented in plaintiff's reply.  (Doc. No. 105.)  Defendants filed their sur-replies on December 6, 2024.[4]  (Doc. Nos. 106–110.)  Defendants generally argue that their contact with plaintiff's customers was not for purposes of solicitation at all but was instead due to three primary reasons:  (1) Defendant Cuevas was forced to continue assisting plaintiff's clients on plaintiff's behalf during and despite his suspension; (2) defendant Cuevas worked with plaintiff's clients in an entirely different capacity after being terminated and finding a job with Primo

/////

/////

/////

/////

---

[4]  On December 9, 2024, plaintiff filed a motion for administrative relief seeking to file a response to defendants' sur-reply in order to present further argument to the court.  (Doc. No. 112.)  The court denied that motion on December 12, 2024.  (Doc. No. 114.)

1  Fitness in a related but distinct industry; and (3) defendant Cuevas had personal friendships with

2  many of plaintiff's clients and employees, including defendant Nesta.  (Doc. Nos. 106–110.)[5]

3  **LEGAL STANDARD**

4        "[D]istrict courts have power to enforce their own orders and to adjudge anyone in civil

5  contempt who willfully violates such orders."  *Davis v. Grossmont Union High Sch. Dist.*, 930

6  F.2d 1390, 1393 (9th Cir. 1991).  "[T]he purpose of civil sanctions is to 'coerce' compliance with

7  a court order or to 'compensate' the aggrieved party for sustained losses."  *Oracle USA, Inc. v.*

8  *Rimini St., Inc.*, 81 F.4th 843, 858 (9th Cir. 2023).  A court may not issue contempt sanctions

9  "when the contested action was 'based on a good faith and reasonable interpretation' of the

10  court's order, when the contested action was in 'substantial compliance' with the order, or when

11  there was only a 'technical violation' of the order."  *Id.* at 851.  "A party moving for civil

12  contempt must prove that the non-moving party has violated a court order by clear and

13  convincing evidence."  *Ahearn ex rel. NLRB v. Int'l Longshore and Warehouse Unions,*

14  *Locals 21 and 4*, 721 F.3d 1122, 1129 (9th Cir. 2013).

15  **ANALYSIS**

16        Plaintiff argues that the court should find defendants to be in contempt of court for

17  violating clause 1(d) of the Injunction, specifically by continuing to do business with the

18

19  [5] On November 14, 2024, defendants' counsel, Paul L. Cass, filed a document styled as a

20  "supplemental affidavit/declaration of Paul L. Cass."  (Doc. No. 101 at 1.)  In that document, defendants' counsel appears to request that the court take judicial notice of the truth of the allegations of a complaint in a civil action filed in another federal district court, though the

21  document is difficult to understand at times.  (*Id.* at 2–4.)  On November 20, 2024, plaintiff filed a request to strike that document from the docket.  (Doc. No. 103.)  Plaintiff points out that,

22  although styled as an "affidavit/declaration," the document is in effect a supplemental brief in opposition to plaintiff's motion to hold defendants in contempt, thereby violates the court's

23  standing order, and should be stricken on that basis alone.  (*Id.* at 1–2.)  The court agrees.  (*See*

24  Doc. No. 3-1 at 2) ("Finally, no supplemental briefs shall be filed without prior leave of court."). The Clerk of the Court will be directed to update the docket to reflect that the affidavit of Paul L.

25  Cass (Doc. No. 101) is hereby stricken.  The court therefore does not consider plaintiff's

26  argument that the document must be stricken as an irrelevant attempt to destroy plaintiff's reputation.  (*See* Doc. No. 103 at 2–3.)  However, defendants' counsel is nevertheless cautioned

27  not to file irrelevant material on the docket and is reminded that California Rule of Professional Conduct 3.1(a) prohibits an attorney from asserting a position in litigation "for the purpose of

28  harassing or maliciously injuring any person."

1   following clients:  Arbitech/Valesea; A1 Fitness/5 Star; Northeast Fitness Solutions; Johnson

2   Health Tech; Hoist Fitness; Classic Home/Classic Concepts; Haifa NA; Life Fitness; California

3   Home Fitness; Crystal Lighting; and Muscle D Fitness.  (Doc. Nos. 87-1 at 7; 99 at 8.)  Below,

4   the court will consider whether plaintiff has provided clear and convincing evidence in support of

5   its motion as to each defendant.

6   **A.    Defendant Cuevas**

7        The court will first provide a general overview of the evidence and arguments supplied by

8   plaintiff relating to defendant Cuevas.  Next, the court will consider whether defendant Cuevas

9   violated the Injunction as to each of the customers specified by plaintiff in its motion.

10       Plaintiff provides two categories of evidence in support of its motion:  defendants' own

11  declarations, which plaintiff contends are incomplete, and the Phone Records.  First, plaintiff

12  argues that defendant Cuevas's declarations reveal how he "directly or indirectly through

13  omission acknowledges initiating contact" with several of plaintiff's customers.  (Doc. No. 87-1

14  at 3.)  Second, plaintiff contends that the Phone Records, and specifically defendant Cuevas's

15  "calling pattern" during June through August of 2023, demonstrate that defendant Cuevas was

16  soliciting plaintiff's customers and not "just engaging in idle chit-chat with friends."  (Doc.

17  No. 99 at 4.)  To that end, plaintiff argues that the Phone Records show that defendant Cuevas

18  was in almost daily contact with defendant Nesta during Cuevas's suspension, and that Cuevas

19  was in almost daily contact with defendant Impala Freight beginning on the date of his

20  termination.  (Doc. No. 99 at 6.)

21       In his declaration filed in response to plaintiff's reply, defendant Cuevas states that even

22  though plaintiff suspended him on June 13, 2023, plaintiff did not provide many of its customers

23  with an alternative method of contacting plaintiff other than through defendant Cuevas.  (Doc.

24  No. 108 at ¶¶ 21–23.)  As a result, according to defendant Cuevas, many of plaintiff's clients—

25  including Arbitech/Valesea, A1 Fitness/5 Star, Northeast Fitness Solutions, Classic Home/Classic

26  Concepts, and Haifa NA—continued to contact him at his personal cell phone after he was

27  suspended.  (*Id.* at ¶ 22.)  Defendant Cuevas declares that he made several attempts to relay

28  urgent customer concerns to plaintiff's CEO, Elijah Rodriguez, during this period, but that

6

1    Rodriguez did not respond to his calls or messages. (*Id.* at ¶ 32.) Instead, according to defendant

2    Cuevas, Rodriguez instructed defendant Nesta and other of plaintiff's employees to reach out to

3    defendant Cuevas for assistance during Cuevas's suspension. (*Id.* at ¶¶ 14, 21.) Plaintiff never

4    provided defendant Cuevas with a work phone, so all business-related calls went to Cuevas's

5    personal cell phone. (*Id.* at ¶ 23.) Defendant Cuevas states that he asked Rodriguez whether he

6    would be compensated for the work performed during his suspension but received no answer.

7    (*Id.*) Defendant Cuevas states that one of the calls in the Phone Records reflects a call from

8    Rodriguez to Cuevas on June 27, 2023 (i.e., during Cuevas's suspension) wherein Rodriguez

9    asked Cuevas for assistance with a client.[6] (*Id.* at ¶ 30.)

10          As to the calls involving defendant Impala Freight, defendant Cuevas declares that a

11    colleague had given him Impala Freight's phone number and recommended he call the company,

12    that he had called Impala Freight on June 20, 2023 to say that he planned to wait out his

13    suspension to see if he would retain his current job, and that he never mentioned the names of any

14    of plaintiff's customers nor even the name of plaintiff itself during that call. (*Id.* at ¶ 43.) On

15    July 5, 2023, defendant Cuevas called Impala Freight to express his gratitude for their interest in

16    him but that he expected to return to work for plaintiff soon. (*Id.* at ¶ 44.) After being terminated

17    30 minutes later, defendant Cuevas called Impala Freight again to notify them that he was moving

18    to Texas to work for Primo Fitness and that he was unsure about accepting Impala Freight's job

19    offer. (*Id.*) According to defendant Cuevas, the many calls between him and defendant Impala

20    Freight between July 5, 2023 and August 21, 2023 were for Cuevas to evaluate whether he

21    wished to return to the brokerage side of the transportation industry and whether Impala Freight

22    would be a good fit for him. (*Id.* at ¶ 51.)

23    /////

---

24

25    [6]  The court notes that the Phone Records do reflect an incoming call on June 27, 2023 from the phone number described by defendant Cuevas as belonging to Rodriguez. (*See* Doc. No. 104 at

26    50.) The court additionally notes approximately 25 calls between defendant Cuevas and that same phone number from June 2 through June 13, the date of Cuevas's suspension. (*See id.* at 9–

27    40.) After June 13, the only calls between defendant Cuevas and that number are the aforementioned June 27 call; a call on July 5, 2023, the day that Cuevas was terminated; and a

28    call on July 12, 2023. (*See id.* at 50, 57, 67.)

Furthermore, according to defendant Cuevas, after his termination, he was required to communicate with Nesta by their respective employers. (*Id.* at ¶¶ 6, 10.) At that time, defendant Cuevas was working for Primo Fitness, a company using plaintiff as its transportation broker. (*Id.*) Nesta handled the Primo Fitness account for plaintiff. (*Id.*)

Additionally, according to defendant Cuevas, many other calls in the Phone Records were personal and social in nature in light of the relationship defendant Cuevas had developed with the individuals at these companies over the course of many years. (*Id.* at ¶ 26.) Defendant Cuevas states in his declaration that none of these conversations involved "solicitations, or any misuse of proprietary data or client data or trade secrets or customer information." (*Id.* at ¶ 27.) To the contrary, defendant Cuevas states that he never mentioned to plaintiff's clients the possibility of working for another company prior to his termination on July 5, 2023, because he wanted to maintain the impression that his relationship with plaintiff, as well as his lifelong relationship with Rodriguez, was stable. (*Id.* at ¶ 33.) For instance, defendant Cuevas states that he has been friends with defendant Nesta and his family for a decade, since before either he or Nesta worked for plaintiff. (*Id.* at ¶ 15.)

### 1. Arbitech/Valesea ("Arbitech")

Plaintiff argues that the Phone Records show that defendant began calling Arbitech the day after plaintiff suspended him and then contacted that customer 22 more times before sending his new job announcement email on August 21, 2023. (Doc. No. 99 at 5) (citing Doc. No. 99-1 at ¶ 4). Plaintiff further argues that defendant Cuevas "apparently" moved loads for Arbitech using another logistics provider while still employed by plaintiff. (*Id.*) (citing Doc. No. 99-1 at ¶ 4). However, the court notes that it appears that plaintiff and Rodriguez have simply assumed that defendant Cuevas was "apparently" improperly moving loads for plaintiff's customers, with no evidence provided in support of that assumption other than Cuevas's phone calls to those customers. (*See* Doc. No. 99-1 at ¶¶ 4, 11.) Finally, plaintiff argues that defendant Cuevas was steering plaintiff's clients to defendant Impala Freight, as shown by back-to-back or three-way calls appearing in the Phone Records on August 14, 2023, involving defendant Cuevas, defendant Impala Freight, and Arbitech. (Doc. No. 99 at 6) (citing Doc. No. 99-1 at ¶ 9).

In his declaration, defendant Cuevas states that he and Pat Johnson, the agent for Arbitech, are personal friends who often discuss various topics unrelated to work. (Doc. No. 108 at ¶¶ 53–54.) In support of this assertion, defendant Cuevas points to the frequency of his calls to and from Johnson in the Phone Records during the period from June 1 through June 13, i.e., the period before Cuevas was suspended by plaintiff. (*Id.*) Defendant Cuevas declares that there would not be so many calls between them if their relationship were strictly professional. (*Id.*) Rather, according to defendant Cuevas, Johnson is known to Cuevas's son as "Uncle Pat," would send gifts to Cuevas's son, and would sometimes play videogames with Cuevas at night. (*Id.*) Additionally, defendant Cuevas states that he does not recall ever being on a three-way call with defendants Nesta and Impala Freight during the dates in question, nor does he see any evidence in the Phone Records of such a call. (*Id.* at 5.)

Defendants additionally filed a declaration from Pat Johnson in connection with their sur-reply. (*See* Doc. No. 107 at 5–9.) In that declaration, Johnson largely reiterates the points mentioned above: Johnson continued to reach out to Cuevas for assistance after Cuevas's suspension because Johnson could not contact anyone working for plaintiff; Cuevas relayed information to plaintiff at Johnson's request; Johnson asked Cuevas to inform him if Cuevas returned to the transportation business after being terminated by plaintiff; and Cuevas and Johnson are friends who often play videogames together at night. (*Id.* at 7–8.)

The court finds that plaintiff has not proven by clear and convincing evidence that defendant Cuevas is violating the Injunction by continuing to do business with Arbitech after having improperly solicited Arbitech using plaintiff's trade secrets. While it is undisputed that defendant Cuevas is continuing to do business with Arbitech, plaintiff has failed to provide clear and convincing evidence that defendant Cuevas misappropriated any of plaintiff's trade secrets in order to acquire Arbitech's business. The primary evidence upon which plaintiff relies, namely the timing and frequency of the calls between defendant Cuevas and Pat Johnson, is minimally probative of misconduct in light of the evidence that Johnson was forced to rely on Cuevas in doing business with plaintiff during the period of Cuevas's suspension. Moreover, the undisputed

/////

1  evidence reflects a close personal relationship between the two individuals that could easily

2  explain many of the phone calls.

3          Furthermore, the Phone Records do not provide any evidence of three-way calls between

4  defendant Cuevas, defendant Impala Freight, and Arbitech on August 14, 2023.[7]  The Phone

5  Records show only two calls involving Arbitech on August 14, 2023, one at 6:04 P.M. and one at

6  7:18 P.M.  (*See* Doc. No. 104 at 101.)  Neither call overlapped with the timing of another phone

7  call.  (*See id.*)  One of those calls does appear to have occurred back-to-back with a call by

8  Cuevas to Impala Freight.  However, the court finds little probative value in such back-to-back

9  calls in light of the frequency with which defendant Cuevas made phone calls in connection with

10  his employment.  That is, defendant Cuevas made many calls every day.  Indeed, as noted, he

11  made 100 phone calls on August 14, 2023 alone.  Many of these calls were back-to-back.  Some

12  of these back-to-back calls involved Impala Freight; many others did not.  The court does not find

13  these calling patterns to be particularly convincing evidence of defendants' purported misconduct.

14          Crucially, plaintiff does not advance any argument regarding defendants' alleged use of

15  bills of lading, sales reports, or other documents comprising the "Pricing Information" described

16  in the court's June 13, 2024 order.  (*See* Doc. No. 54 at 12–14.)  In granting the Injunction, the

17  court specifically noted that "[m]erely informing a former employer's customers of a change of

18  employment, *without more*, is not solicitation."  (*Id.* at 17) (alterations in original) (quoting *MAI*

19  *Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993)).  The court emphasized that

20  it would grant plaintiff's motion for a preliminary injunction because the evidence presented in

21  support of that motion suggested "that defendants also downloaded and used information

22

---

23  [7]  The court notes that the Phone Records contain evidence of 100 calls made by defendant
24  Cuevas on August 14, 2023.  (*See* Doc. No. 104 at 99–101.)  Despite bearing the heavy burden
    attendant to a motion for contempt, plaintiff does not specify which of these 100 calls were three-
25  way or back-to-back, nor are any calls marked as such in the Phone Records.  Nor did plaintiff
    identify any phone number as belonging to Arbitech—or any customer—in its briefing, hindering
26  the court's ability to independently review the Phone Records.  However, defendant Cuevas
    provided purported phone number for several individuals, including Arbitech's agent, Pat
27  Johnson, in his declaration.  (Doc. No. 108 at 14–15.)  In the absence of any other information,
    the court relies on the phone numbers provided by defendant Cuevas in his declaration in
28  evaluating the Phone Records.

1    regarding clients' needs and the pricing of past jobs." (*Id.* at 18.)  Here, plaintiff has not pointed

2    to any evidence suggesting that the Pricing Information contained information relating to

3    Arbitech, or that defendants used any such information in connection with their dealings with

4    Arbitech.  Nor has the court found any such evidence upon its review of the record.

5         Plaintiff does argue, albeit in unclear fashion, that the court should infer that defendants

6    used "TLG information" to solicit plaintiff's customers based on defendants' alleged spoliation of

7    evidence.  (Doc. No. 87-1 at 6) (citing Fed. R. Civ. P. 37(e)); *see also* Fed. R. Civ. P. 37(e)(1) ("If

8    electronically stored information that should have been preserved in the anticipation or conduct of

9    litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be

10   restored or replaced through additional discovery, the court . . . upon finding prejudice to another

11   party from loss of the information, may order measures no greater than necessary to cure the

12   prejudice . . . .").  If the court finds that a party "acted with the intent to deprive another party of

13   the information's use in the litigation," the court may "presume that the lost information was

14   unfavorable to the party." Fed. R. Civ. P. 37(e)(2).

15        Here, plaintiff does not specify whether its reference to "TLG information" is a reference

16   to any of the Pricing Information.  In any event, the court will not infer that defendants used the

17   Pricing Information to solicit plaintiff's customers based on defendants' alleged spoliation of

18   evidence.  It is undisputed that defendant Cuevas filed his discovery responses on November 15,

19   2023, the day they were due, and claimed therein that his iPhone had been accidentally wiped of

20   its information during repairs at the Apple store three days earlier.  (*See* Doc. No. 54 at 5.)  It is

21   also undisputed that defendant Nesta physically destroyed his cell phone at some point after

22   receiving Rodriguez's August 23, 2023 email instructing Nesta to "erase, delete, and destroy" any

23   personal property containing plaintiff's data.  (*See id.* at 4.)

24        While the court finds defendant Cuevas's conduct to be arguably suggestive of spoliation,

25   plaintiff provides no evidence that defendant Cuevas somehow manipulated his iPhone to be

26   wiped by Apple employees during repairs.  Similarly, while Rodriguez's August 23, 2023 email

27   may best be read to impliedly instruct defendant Nesta to destroy only the data on his cell phone,

28   the plain text of the email did instruct Nesta to destroy the personal property containing the

11

1   data—i.e., his phone.  The court is therefore quite hesitant to conclude in these circumstances that

2   defendants "acted with the intent to deprive another party of the information's use in the

3   litigation."  Fed. R. Civ. P. 37(e)(2).  Moreover, plaintiff has made no showing that the lost

4   information "cannot be restored or replaced through additional discovery."  Fed. R. Civ. P. 37(e).

5   Most importantly, even if the court were to find spoliation to have occurred, the court would not

6   find it appropriate to infer on that basis that the deleted information contained, specifically, clear

7   and convincing evidence that defendants used Pricing Information related to a particular

8   defendant, such as Arbitech here, that would support a finding of contempt of court.  Particularly

9   in light of the little probative value of the Phone Records, the court will decline to grant plaintiff's

10  request that defendants be jailed or fined $10,000 per day almost entirely on the basis of an

11  inference drawn from a not fully supported claim of spoliation.[8]  (*See* Doc. No. 87-1 at 7.)

12          In sum, the court concludes that plaintiff has failed to show by clear and convincing

13  evidence that defendant Cuevas has violated the Injunction as to plaintiff's customer Arbitech.

14  *See Oakiwear Outdoor, LLC v. Timbee, LLC*, No. 17-cv-05202-BHS, 2017 WL 3670561, at *3

15  (W.D. Wash. Aug. 25, 2017) ("Regarding Oakiwear's allegations that Timbee is improperly

16  contacting certain clients and manufacturers, Oakiwear has failed to meet its burden.  . . .  Timbee

17  asserts that '[certain customers] independently contacted Timbee and placed orders at a trade

18  show.'  Oakiwear has failed to produce clear and convincing evidence to the contrary.  . . .

19  Therefore, the Court denies Oakiwear's motion for contempt.") (internal citation omitted); *cf.*

20  *Softketeers, Inc. v. Regal West Corp.*, No. 19-cv-00519-JWH-JDE, 2023 WL 2024701, at *16–17

21  (C.D. Cal. Feb. 7, 2023) ("[T]he Court is convinced that misappropriation occurred, but it cannot

22  clearly or convincingly determine who precisely is responsible.  . . .  [The plaintiff] tries to argue

23  that each individual Defendant is a culprit and can be found in contempt.  The Court is not

24  persuaded that [the plaintiff] has met its formidable burden."); *Kinect Renewable Sols., LLC v.*

---

[8]  To clarify, the court notes that it is not making a finding as to whether defendants engaged in spoliation of evidence.  Rather, the court concludes only that even if spoliation did occur, the court still would not presume that the deleted information, in connection with the minimal other evidence presented by plaintiff, would provide a sufficient basis upon which to find defendants to be in contempt of court.

1    *DesVerney*, No. 22-cv-00423-JGB-SP, 2022 WL 3013206, at *7 (C.D. Cal. June 10, 2022)

2    (denying the plaintiff's motion for contempt where the defendants' "conduct strongly suggests

3    noncompliance" with the temporary restraining order prohibiting the defendants from using the

4    plaintiff's "Customer lists" and "Pricing information," but where "[t]he evidentiary discrepancies

5    preclude a finding of clear and convincing evidence").

6         2.    A1 Fitness/5 Star ("A1 Fitness")

7         Plaintiff argues that the Phone Records show that defendant Cuevas contacted A1 Fitness

8    11 times after plaintiff suspended him, including twice on the day after his suspension and three

9    times on the day after plaintiff terminated him.  (Doc. No. 99 at 5) (citing Doc. No. 99-1 at ¶ 5).

10   Plaintiff contends that the timing of these calls belies defendant Cuevas's claim that he was

11   merely making social calls to friends.  (*Id.*)

12        In his declaration, defendant Cuevas states as follows.  Dan Lapp, the owner of A1

13   Fitness, called Cuevas on June 14, 2023, expressed concern about Cuevas's suspension by

14   plaintiff because Cuevas had been personally managing Lapp's projects for a long time, and

15   requested that Cuevas keep Lapp and his employee Zekah Crook[9] "in the loop on any changes or

16   to merely just stay in touch."  (Doc. No. 108 at ¶ 63.)  Outside of work, defendant Cuevas often

17   spoke with Crook about personal interests, such as cigars and whiskey, and the two had been in

18   regular contact as friends even before Cuevas's suspension by plaintiff.  (*Id.* at ¶ 64.)  Defendant

19   Cuevas repeatedly reassured Lapp and Crook that he would return to work for plaintiff on July 5,

20   2023 and asked them to remain patient.  (*Id.*)  After instead being terminated on July 5, defendant

21   Cuevas began working for Primo Fitness.  (*Id.* at ¶ 65.)  Primo Fitness is a company in the

22   business of installation of fitness equipment; it is not a transportation company like plaintiff.  (*Id.*)

23   A1 Fitness is also in the fitness equipment installation business and had collaborated on projects

24   with Primo Fitness for years.  (*Id.*)  In his role at Primo Fitness, defendant Cuevas spoke with

25   Lapp and Crook regarding joint pre-existing projects between Primo Fitness and A1 Fitness.  (*Id.*

26   at ¶ 67.)  There was no mention of defendant Impala Freight during these conversations.  (*Id.*)

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28   [9]  Defendants variously refer to this individual as "Zekah Crook" and "Zekah Crooks."  The court
     will refer to him as "Crook" for simplicity.

1 Lapp did not switch his business from plaintiff to defendant Impala Freight until October 5, 2023,

2 and even then it was Lapp who contacted Cuevas to discuss the switch. (*Id.* at ¶¶ 69–71.)

3 Defendant Cuevas was hesitant to communicate with Lapp until Lapp reassured him that the

4 communication was not a "setup" to support a solicitation claim by plaintiff. (*Id.* at ¶ 70.)

5       Defendants have also filed the declaration of Leo Marangi, the owner of Primo Fitness, in

6 connection with their sur-reply. (*See* Doc. No. 107 at 10–14.) In his declaration, Marangi

7 corroborates certain aspects of defendant Cuevas's account: Lapp asked Marangi about

8 Marangi's transportation provider in October 2023; Marangi told Lapp he was using defendants

9 Cuevas and Impala Freight; Lapp was unaware that Cuevas was working for Impala Freight until

10 Marangi told him; and Marangi encouraged Lapp to contact Cuevas. (*Id.* at 13–14.)

11       Additionally, defendants have filed the declaration of Dan Lapp in connection with their

12 sur-reply. (*See* Doc. No. 107 at 41–47.) In his declaration, Lapp also corroborates aspects of

13 defendant Cuevas's account: Lapp called Cuevas on June 14, 2023 while unaware of Cuevas's

14 suspension by plaintiff; Lapp asked Cuevas to keep in touch due to concerns over Rodriguez's

15 ability to communicate with him; Lapp continued his communication with Cuevas after Cuevas

16 began working for Primo Fitness; Lapp contacted Marangi in October 2023 regarding finding a

17 new broker to replace plaintiff; Marangi recommended Cuevas; and Lapp called Cuevas on

18 October 5, 2023 to discuss the switch to Impala Freight. (*Id.* at 42–44.) According to Lapp,

19 Cuevas was hesitant to communicate on this subject until Lapp reassured him that Lapp was not

20 trying to "entrap [Cuevas] into some claim of solicitation." (*Id.* at 44; *see also id.* at 45.)

21       Defendants have also filed the declaration of Zekah Crook in connection with their sur-

22 reply. (*See* Doc. No. 107 at 48–52.) In his declaration, Crook also corroborates defendant

23 Cuevas's account: Crook was dissatisfied with Cuevas's replacement during Cuevas's

24 suspension by plaintiff; Crook asked plaintiff to have Cuevas contact him; Crook reached out to

25 Cuevas directly during Cuevas's suspension regarding Crook's concerns; Crook asked Cuevas to

26 keep in touch; Crook seconded Marangi's recommendation of Cuevas in October 2023; and Lapp

27 contacted Cuevas on October 5, 2023. (*Id.* at 50–51.)

28 /////

While it is undisputed that defendant Cuevas is continuing to do business with A1 Fitness, plaintiff has failed to provide clear and convincing evidence that defendant Cuevas misappropriated any of plaintiff's trade secrets in order to acquire A1 Fitness's business. The primary evidence upon which plaintiff relies, namely the timing and frequency of the calls between defendant Cuevas, Lapp, and Crook, is minimally probative of misconduct in light of the evidence that these calls concerned joint pre-existing projects between companies in a different industry than plaintiff's. Moreover, the evidence before the court reflects that A1 Fitness did not switch its business from plaintiff to defendant Impala Freight until October 2023, months after the telephone calls in August 2023 that plaintiff relies on. Even then, the switch occurred at the insistence of A1 Fitness and despite the hesitation of defendant Cuevas. Finally, plaintiff has again failed to provide any evidence that defendant Cuevas used any of the Pricing Information in his dealings with A1 Fitness.

The court therefore concludes that plaintiff has failed to show by clear and convincing evidence that defendant Cuevas has violated the Injunction as to plaintiff's customer A1 Fitness. *See Oakiwear Outdoor*, 2017 WL 3670561, at *3; *cf. Softketeers*, 2023 WL 2024701, at *16–17; *Kinect Renewable Sols.*, 2022 WL 3013206, at *7.

        3.    <u>Northeast Fitness Solutions ("Northeast")</u>

Plaintiff argues that the Phone Records show that defendant Cuevas called Northeast four times on the day after plaintiff suspended him, made three more calls to Northeast in the following week, and then traveled across to Pennsylvania to meet with Northeast at their offices in person. (Doc. No. 99 at 5) (citing Doc. No. 99-1 at ¶ 6). Plaintiff contends that defendant Cuevas subsequently called Northeast 25 times over the following two months. (*Id.* at 5–6.) Plaintiff argues that such frequency and timing are "indicative of a concerted effort to steer customers toward an anticipated new venture." (*Id.* at 6.)

In his declaration, defendant Cuevas states the following. He has been family friends with Vince and Ann Leonard, the owners of Northeast, for four or five years. (Doc. No. 108 at ¶ 74.) Vince Leonard has shown great interest in Cuevas as a person and reached out several times after Cuevas was suspended by plaintiff to try to hire him. (*Id.* at ¶¶ 79, 82.) The Leonards had invited

him to stay at their home in Pennsylvania to attend a graduation party for their son, with whom defendant Cuevas is also friends. (*Id.* at ¶ 74.) The trip was planned long before Cuevas was suspended. (*Id.*) Indeed, Rodriguez knew of this planned trip and refused to cover any travel costs because it was a personal matter. (*Id.*) Cuevas paid for the trip himself and did not stay at a hotel, as he would have were he on a business trip. (*Id.* at ¶ 75.) The graduation party was held on June 24, 2023, during Cuevas's suspension. (*Id.* at ¶ 78.) After Cuevas was terminated, he turned down a job offer from Northeast to go to work for Primo Fitness. (*Id.* at ¶ 82.) Primo Fitness operates in the same industry as Northeast and the two companies frequently collaborate. (*Id.* at ¶ 84.) Cuevas does not deny calling Northeast and its agents after his termination by plaintiff, but states that these calls were all either personal or related to his new role at Primo Fitness. (*Id.* at ¶ 85.)

Defendants have also filed the declaration of Vince Leonard, the owner of Northeast, in connection with their sur-reply. (*See* Doc. No. 107 at 36–40.) In his declaration, Leonard largely corroborates the information provided by defendant Cuevas: Cuevas handled Northeast's account for plaintiff; Vince and Ann Leonard developed a personal relationship with Cuevas and had numerous personal phone calls; when Leonard and his family traveled to California, Cuevas would take them on tours of the Bay Area; Cuevas became friends with Leonard's son; the Leonards invited Cuevas to the graduation party; Cuevas stayed at their home; Leonard repeatedly offered to hire Cuevas upon hearing of Cuevas's suspension by plaintiff; and after receiving Cuevas's August 2023 email announcing his new position at defendant Impala Freight, Leonard contacted Cuevas to switch his business from plaintiff to Impala Freight. (*Id.* at 37–39.)

Again, while it is undisputed that defendant Cuevas is continuing to do business with Northeast, plaintiff has failed to provide clear and convincing evidence that defendant Cuevas misappropriated any of plaintiff's trade secrets in order to acquire Northeast's business. The primary evidence upon which plaintiff relies, namely the timing and frequency of the telephone calls between defendant Cuevas and Vince Leonard, is minimally probative of misconduct in light of the evidence that these calls concerned joint pre-existing projects between companies in a different industry than plaintiff's. Moreover, the undisputed evidence before the court reflects a

1    close personal relationship between Cuevas and Leonard that could easily explain many of the

2    phone calls.  Finally, plaintiff has again failed to come forward with any evidence that defendant

3    Cuevas used any of the Pricing Information in his dealings with Northeast.

4          The court therefore concludes that plaintiff has failed to show by clear and convincing

5    evidence that defendant Cuevas has violated the Injunction as to plaintiff's customer Northeast.

6    *See Oakiwear Outdoor*, 2017 WL 3670561, at *3; *cf. Softketeers*, 2023 WL 2024701, at *16–17;

7    *Kinect Renewable Sols.*, 2022 WL 3013206, at *7.

8          4.    Johnson Health Tech ("Johnson Health")

9          Plaintiff argues that the Phone Records show that defendant Cuevas spoke with its

10   customer Johnson Health for 52 minutes on the day after plaintiff terminated him, and that

11   defendant Cuevas called Johnson Health seven more times in the first half of August 2023.  (Doc.

12   No. 99 at 6) (citing Doc. No. 99-1 at ¶ 7).  Plaintiff further argues that defendant Cuevas was

13   diverting Johnson Health's business to defendant Impala Freight, as evidenced by back-to-back or

14   three-way calls involving defendant Cuevas, defendant Impala Freight, and Johnson Health on

15   August 7, 2023.  (*Id.*) (citing Doc. No. 99-1 at ¶ 9).

16         In his declaration, defendant Cuevas states the following.  Vince Leonard, the owner of

17   Northeast, works closely with Johnson Health on a daily basis.  (Doc. No. 108 at ¶ 81.)  Leonard

18   discussed his attempts to hire Cuevas with managers at Johnson Health, prompting Johnson

19   Health to tell Leonard that Cuevas should inform Johnson Health if he returned to the

20   transportation industry.  (*Id.*)  Johnson Health operates in the same industry as Primo Fitness and

21   the two companies collaborate frequently.  (*Id.* at ¶ 84.)  For instance, Primo Fitness often

22   removes old equipment from Planet Fitness gyms the night before new equipment is installed by

23   Johnson Health.  (*Id.* at ¶ 92.)  After being terminated and moving to Primo Fitness, Cuevas

24   worked with Johnson Health in the context of the pre-existing collaborations between the two

25   companies, such as the aforementioned Planet Fitness projects.  (*Id.* at ¶¶ 84, 93.)  Cuevas does

26   not dispute contacting Johnson Health but instead maintains that these calls were due to his new

27   role at Primo Fitness.  (*Id.* at ¶ 85.)  He states that the calls with Johnson Health had nothing to do

28   with defendant Impala Freight and involved no solicitation by Cuevas.  (*Id.* at ¶ 96.)

1    Leo Marangi, the CEO of Primo Fitness, also states in his declaration that Cuevas was

2 required by his job with Primo Fitness to work with defendant Nesta and to set up conference

3 calls with Johnson Health on Cuevas's personal cell phone.  (Doc. No. 107 at 12.)

4    Again, while it is undisputed that defendant Cuevas is continuing to do business with

5 Johnson Health, plaintiff has failed to provide clear and convincing evidence that defendant

6 Cuevas misappropriated any of plaintiff's trade secrets in order to acquire Johnson Health's

7 business.  The primary evidence upon which plaintiff relies, namely the timing and frequency of

8 the calls between defendant Cuevas and unspecified agents of Johnson Health, is minimally

9 probative of misconduct in light of the evidence that these calls concerned specific, joint pre-

10 existing projects between companies in a different industry than plaintiff's.  The court also finds

11 little probative value in any "three-way calls" involving Johnson Health given that one of

12 defendant Cuevas's responsibilities at Primo Fitness was setting up such conference calls.[10]

13 Moreover, plaintiff has again failed to provide any evidence that defendant Cuevas used any of

14 the Pricing Information in his dealings with Johnson Health.

15    The court therefore concludes that plaintiff has failed to show by clear and convincing

16 evidence that defendant Cuevas has violated the Injunction as to plaintiff's customer Johnson

17 Health.  *See Oakiwear Outdoor*, 2017 WL 3670561, at *3; *cf. Softketeers*, 2023 WL 2024701, at

18 *16–17; *Kinect Renewable Sols.*, 2022 WL 3013206, at *7.

19    5.    Hoist Fitness, Classic Home/Classic Concepts, Haifa NA, Life Fitness, California

20       Home Fitness, Crystal Lighting, and Muscle D Fitness

21    Plaintiff cites the Rodriguez declaration in support of its contention that defendants

22 solicited plaintiff's customers listed above.  (Doc. No. 99 at 8) (citing Doc. No. 99-1 at ¶¶ 4–8).

23 As relevant here, Rodriguez declares vaguely only that based on his review of the Phone Records

24

25 [10]  Again, plaintiff does not specifically identify which of the calls in the Phone Records are
purportedly three-way calls involving Johnson Health on August 7, 2023.  The Phone Records
26 contain over 60 phone calls involving defendant Cuevas on that date.  (*See* Doc. No. 104 at 90–
91.)  Nor does plaintiff inform the court of Johnson Health's phone number.  The court has
27 nevertheless identified in the Phone Records what appears to be one three-way call involving
defendant Cuevas, defendant Nesta, and Johnson Health, lasting one minute at 1:55 P.M. on
28 August 7, 2023.  (*See id.* at 90.)

18

1    and his familiarity with the listed customers' phone numbers, defendant Cuevas called the listed

2    customers beginning in June 2023. (Doc. No. 99-1 at ¶ 8.)

3           In his declaration, defendant Cuevas provides statements similar to those he has provided

4    with respect to the other clients described above, namely that he is personal friends with agents

5    for some of these clients (Doc. No. 108 at ¶¶ 107, 113) and that the Phone Records show no calls

6    with certain of these clients during the period of his suspension and instead only reflect calls with

7    these clients related to his employment with Primo Fitness (*id.* at ¶¶ 100, 101, 110). Moreover,

8    defendant Cuevas provides phone numbers for certain of the listed clients and points out that

9    these phone numbers do not appear at all in the Phone Records after his suspension. (*Id.* at

10   ¶¶ 100, 104.) Defendants have also provided declarations from many of the agents or owners of

11   the listed clients corroborating the details appearing in Cuevas's declaration. (*See* Doc. No. 107.)

12   For instance, the logistics manager for Crystal Lighting states in his declaration that he asked

13   defendant Cuevas for a bid from plaintiff in July 2023, that defendant Cuevas replied that he had

14   been terminated by plaintiff, and that the logistics manager then asked Cuevas to notify the

15   manager if Cuevas ever returned to the transportation business. (*Id.* at 20.) The manager further

16   declares that he reached out to Cuevas again in August 2023 after forgetting Cuevas had left

17   plaintiff's employ, and Cuevas reminded him of the termination. (*Id.* at 20–21.)

18          Plaintiff has provided even less evidence as to these listed customers than it presented as

19   to customers such as Arbitech and A1 Fitness discussed above. Rodriguez does not identify

20   which phone numbers in the Phone Records correspond to which customers, how many times

21   defendant Cuevas called each customer, the duration of the calls, or otherwise provide any further

22   information as to the listed defendants. Rodriguez merely declares that there would be no reason

23   for defendant Cuevas to make these calls "unless he was attempting to cut TLG out of the picture

24   while still employed by the company" (*id.*), but he does not state how he would or could have

25   personal knowledge of such a fact. In contrast, defendant Cuevas explains the reasons for these

26   calls in his declarations, reasons that are corroborated by declarations from agents or owners of

27   the listed customers. Importantly, Rodriguez again does not state that defendant Cuevas used any

28   /////

1   of the Pricing Information as to these customers, nor does plaintiff provide any evidence to that

2   effect.[11]

3       The court therefore concludes that plaintiff has failed to show by clear and convincing

4   evidence that defendant Cuevas has violated the Injunction as to plaintiff's customers listed

5   above. *See Oakiwear Outdoor*, 2017 WL 3670561, at *3; *cf. Softketeers*, 2023 WL 2024701, at

6   *16–17; *Kinect Renewable Sols.*, 2022 WL 3013206, at *7.

7   **B.    Defendant Adam Nesta**

8       The bulk of the evidence provided by plaintiff in connection with its motion for contempt

9   pertains to alleged misconduct by defendant Cuevas.  Plaintiff provides comparatively little

10  evidence as to any alleged misconduct on the part of defendant Nesta, and the court finds that

11  evidence to have little probative value in light of defendant Nesta's declaration filed on

12  December 6, 2024 (Doc. No. 109).

13      Plaintiff argues that the Phone Records show that defendant Nesta was in almost daily

14  telephone contact with defendant Cuevas while Cuevas was suspended.  (Doc. No. 99 at 6) (citing

15  Doc. No. 99-1 at ¶ 9).  But in his declaration, defendant Nesta states that Rodriguez frequently

16  directed employees, including Nesta, to contact defendant Cuevas during his suspension for

17  assistance with questions or issues that Rodriguez was unable to address.  (Doc. No. 109 at ¶ 3.)

18  In support of this statement, defendant Nesta provides phone numbers for several of plaintiff's

19  employees and argues that the Phone Records show that these employees also called defendant

20  Cuevas frequently during his suspension.  (*Id.* at ¶ 5.)  Indeed, the court notes approximately 18

21  incoming calls to defendant Cuevas from plaintiff's employee Jacob Garcia during Cuevas's

22  suspension, as well as one call involving Rodriguez and one call involving plaintiff's owner

23  during Cuevas's suspension.  (*See* Doc. No. 104 at 40–57.)  As discussed above, defendant

24  Cuevas provides similar statements in his own declaration.

25      Plaintiff argues that the Phone Records show that defendant Nesta continued to call

26  defendant Cuevas frequently after Cuevas was terminated.  (Doc. No. 99 at 6) (citing Doc.

27

28  [11]  In fact, as to Muscle D, there is not even evidence that defendant Cuevas continued to conduct business with that client after the Injunction was issued.

20

1    No. 99-1 at ¶ 9).  But in his declaration, defendant Nesta states that when Rodriguez was

2    reassigning Cuevas's old accounts, Rodriguez assigned the Primo Fitness account to defendant

3    Nesta.  (Doc. No. 109 at ¶ 18.)  Consequently, defendants Nesta and Cuevas were required to be

4    in frequent contact for their jobs.  (*Id.* at ¶ 19.)  Additionally, defendant Nesta states that he would

5    sometimes call Cuevas for personal reasons as they share a decade-long friendship that

6    commenced before they worked for plaintiff.  (*Id.* at ¶ 24.)  As discussed above, defendant

7    Cuevas provides similar statements in his declaration.

8         Plaintiff argues that the Phone Records show that defendant Nesta participated in three-

9    way calls with defendants Cuevas and Impala Freight in early August 2023, while still employed

10   by plaintiff.  (Doc. No. 99 at 6) (citing Doc. No. 99-1 at ¶ 10).  Defendant Nesta denies ever

11   doing so.  (Doc. No. 109 at ¶ 20.)  Plaintiff did not specify which calls in the Phone Records it is

12   referring to in this regard, and upon reviewing the Phone Records, the court did not identify any

13   such three-ways calls between defendants Nesta, Cuevas, and Impala Freight in early August

14   2023.

15        Plaintiff argues that the Phone Records show that defendant Nesta began contacting

16   plaintiff's customers as soon as he resigned from plaintiff's employ.  (Doc. No. 99 at 6–7) (citing

17   Doc. No. 99-1 at ¶ 10).  The only customers specified by plaintiff in this regard are Arbitech and

18   Johnson Health.  (*See* Doc. No. 99-1 at ¶ 10.)  According to defendant Nesta, the Phone Records

19   show that Pat Johnson from Arbitech contacted Nesta on the day prior to Nesta's resignation

20   regarding active projects that Nesta was handling and that these communications continued on

21   August 18, 2023, the day of Nesta's resignation.  In his declaration, Pat Johnson corroborates

22   defendant Nesta's account.  (*See* Doc. No. 106 at 8–9.)  According to defendant Nesta, the calls

23   and text messages on the day of his resignation and the following days were all either plaintiff's

24   clients contacting him regarding active projects—to whom he responded that he had resigned

25   from his job with plaintiff—or defendant Nesta proactively informing the clients that he had

26   resigned.  (Doc. No. 109 at ¶¶ 40–44.)

27        In sum, the only evidence presented by plaintiff in support of its motion is essentially a list

28   of calls and text messages in the Phone Records, combined with plaintiff's assertion that such

frequent calls simply could not be anything other than solicitation involving the misappropriation of trade secrets.  As above, plaintiff has failed to provide any evidence that defendant Nesta used Pricing Information related to any specific customer.  In response, defendant Nesta has provided explanations for the frequency of the calls with defendant Cuevas and plaintiff's former customer and pointed out that plaintiff has seemingly mischaracterized the Phone Records in part.

The court therefore concludes that plaintiff has failed to show by clear and convincing evidence that defendant Nesta has violated the Injunction as to any of plaintiff's customers.  *See Oakiwear Outdoor*, 2017 WL 3670561, at *3; *cf. Softketeers*, 2023 WL 2024701, at *16–17; *Kinect Renewable Sols.*, 2022 WL 3013206, at *7.

**C.    Defendant Impala Freight**

Plaintiff does not argue that defendant Impala Freight is responsible for any misconduct separate from the alleged misconduct of defendants Cuevas and Nesta.  Nor does the court have before it any evidence of such misconduct.  Accordingly, for the reasons discussed above, and because plaintiff has provided no evidence of misconduct by defendant Impala Freight, the court concludes that plaintiff has failed to show by clear and convincing evidence that defendant Impala Freight has violated the Injunction as to any of plaintiff's customers.

<b>CONCLUSION</b>

For the reasons discussed above:

1.    Plaintiff's motion seeking to have defendants held to be in contempt of court (Doc. No. 87) is DENIED; and

2.    The Clerk of the Court is directed to update the docket to reflect that the affidavit of Paul L. Cass (Doc. No. 101) has been stricken pursuant to this order.

IT IS SO ORDERED.

Dated:   **April 3, 2025**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE